The appellant was found guilty of the offenses of first degree robbery, first degree rape, first degree burglary and first degree theft, and was sentenced pursuant to the provisions of the Alabama Habitual Felony Offender Act to life imprisonment without parole (as to the first degree robbery, first degree rape, and first degree burglary convictions), and also sentenced to life imprisonment (as to the first degree theft charge). From said convictions and sentences, this appeal follows.
On appeal, appellant presents two issues for review: (1) whether the State failed to prove a prima facie case; and (2) whether certain evidence pertaining to appellant's fingerprints (which were found in the victim's home) should have been admitted by the trial court. For the reasons outlined below, neither of these arguments has merit and the cause is due to be affirmed.
The victim testified that she was a student at Alabama A M University and was living, during the time in question, in a house with girlfriends who were also University students. On Sunday, May 14, 1984, the victim testified, her roommates had attended graduation exercises and had moved their belongings out of the house. Although the appellant had been living in the house next door for a few weeks,[1] neither the victim nor any of her roommates had ever talked or associated with him. On one occasion, however, the appellant asked the victim's boyfriend if he was from Michigan.[2] The victim further testified that she had never seen the appellant do anything other than sit outside on the porch "all day long."
The victim testified that after her roommates had left, she decided to go see a friend's new apartment, and she stated as follows:
 "I was leaving and he was standing outside and, like a dummy, I asked him was he going to be here for a while. He said, `Yes.' I said, `could you do me a favor and kind of watch out over here because I am going to be by myself for the next week or so until my new roommates get here.' He said, `Sure.' I said, `well, my name is Samantha.' He said, `My name is James.' So I got in the car and left."
After the victim returned to the house, the appellant came by and asked her if he could cut her yard. The victim told him she would let him know.
The next day, as the victim was leaving the house, she asked him how much he would charge to mow the grass, and he said, "ten dollars." After she paid him the *Page 192 
ten dollars, the victim left for work and, when she returned, the grass had been cut. A little while later, the victim went with a friend on a picnic.
After she had returned from a picnic with her boyfriend, the victim went to sleep while watching television. Later, she was awakened when someone jumped on the bed and covered her face with a coat or blanket. The victim assumed that one of her roommates had returned and was playing a prank on her, since they would have been the only ones with a key to the house. However, when she told the person to "stop playing," a male voice told her, "I'm not playing with you. I'll cut your neck off."
At that point, the victim was frightened and felt a knife on her leg. The intruder asked for her money and the victim told him where to find her purse. During the time of the assault, the assailant asked the victim numerous personal questions, such as whether she was alone; where her boyfriend was from; whether her boyfriend would be returning; whether her boyfriend went to school; whether she and her boyfriend had sex; and what she and her boyfriend did when they were together. At one point, the assailant told the victim that her boyfriend was "over there too much for us not to be doing anything." Although she had "more sense" than to say anything about it, the victim testified that she became suspicious that her assailant was the man she had seen sitting outside next door who was able to see everybody "coming and going all the time."
The victim stated that she was raped at knifepoint and that afterwards her assailant wanted to discuss whether he was as good sexually as her boyfriend. Additionally, the attacker forced the victim to submit to other unnatural sex acts, including oral sex. After the sexual assault, the victim was told that he was going to take her car. The victim was also told that she would be watched and if she did not call the police, or anybody else, that he would leave her car somewhere close and return the car keys to her mailbox. Before he left, the assailant asked her when she had to be at work the next morning. The victim testified that the assailant told her that "he knew me but I didn't know him."
During the attack, the assailant kept the victim's head covered with a blanket or coat so that she did not see his face. Additionally, the victim stated that she could not recognize the voice of her assailant. The victim stated that during the time the assailant was in the house, the victim stated that she was afraid of him and that he constantly threatened to kill her. When the assailant left, he took with him approximately $40.00 from her purse, as well as her car keys. After he left, the victim called a neighbor with Community Watch and then called the police. When the police arrived, they dusted the house for fingerprints and took the victim to the hospital.
The State called to the stand Susan Lowery, Registered Nurse, Huntsville Hospital, who testified that she performed certain tests on the victim and worked up a rape "kit" which was then delivered to the Huntsville Police Department. Ms. Lowery testified that, when she saw the victim, the victim was "very upset," "very frightened." Additionally, the witness observed scratches with "dried blood" on the back of the victim's neck. Dr. Throck Morton, physician, Huntsville Hospital Emergency Medical Room, also testified that he performed certain tests on the victim. The chain of custody of the rape kit was established and testimony presented that sperm was found in the samples taken from the victim's vaginal area and buttocks.
The State also called Danny Lamont, fingerprint technician, Huntsville Police Department, to the stand. After testifying as to his qualifications, the witness proceeded to establish that latent prints found on the inside of the victim's windowsill matched those of the appellant. On behalf of the State, Detective Shepard, Atlanta Police Department Auto Theft Squad, testified that on May 19, 1984, he received a tip concerning the location of a stolen car. The caller gave a tag number which matched the tag issued to a car which the *Page 193 
Huntsville Police Department had reported stolen.
On the afternoon of Sunday, May 20, the witness stated, he spotted the car in the general vicinity of where it had been reported and followed it until such time as he was able to stop the driver and place him under arrest. According to the witness, the appellant was the person who was driving the car and placed under arrest. When a search of the automobile was made, a knife was found underneath the floormat on the driver's side of the car.
Ron Adams, Huntsville Police Department, Crime Scene Investigator, testified that he went to the victim's house to "process the scene." At that time, he determined that the point of entry to the house was a bedroom window. In the window of one of the bedrooms, the witness observed that a purse and its contents had been emptied on the bed and all over the floor area. Additionally, the witness took certain latent fingerprints from the point of entry on the inside of the bedroom window.
At this point, the State rested and defense counsel filed a motion to exclude the State's evidence and dismiss the indictment for failure to prove a prima facie case. After the trial court overruled the defense motion, the defense called two witnesses. The first witness, Dorothy Lewis, testified that she was "related" to the appellant. The witness stated that she lived in the house next door to the victim. The witness also stated that the appellant had been spending some time at the house, since that is where his mother and stepfather live. The witness testified that between 3:30 and 4:30 on the afternoon before the night in question, she had seen the appellant at the VFW Club.
The appellant also called his wife, Mary Lou Moore, to the stand. Mrs. Moore testified that she had not lived with the appellant for 14 years. Although she could not recall the exact date, the witness stated that one night she had called the police to have the appellant "put out of the house." According to the witness, the appellant started pushing her and "jumped" on her when she refused to let her daughter get up and go over to the appellant's mother's house.
At this point, the defense recalled to the stand James Parker, Detective, Huntsville Police Department. The witness testified that in June of 1984, he went to the Fulton County Jail in Atlanta, Georgia, to question the appellant. After advising the appellant of his rights, the witness stated that the appellant told him the following:
 "Him and Charles Watkins had gone to the VFW Club where they were playing pool. He was with Ella Mae Pearson who lives in Council Court. He had won some money off of Charles and Charles later asked him if he was driving and he told him no. Charles then said that he had two girls in Chattanooga. He said that Charles left the club and later came back with a car, after 2:00 a.m. And he left the club with Charles and the two girls where they went to Chattanooga, Tennessee. The next evening he went by bus and went to Atlanta, Georgia, where he was working. The following Sunday Charles came to his house at 315 Lockin Street where he was driving the car. They did not have anything to drink or any money. He got in the car to go get some and was stopped by the Atlanta police."
According to the witness, the appellant denied that he had raped anyone or broken into a house or robbed anyone. The witness also stated that the appellant told him that he did not know where "Charles Watkins" lived, but that he did not live in Huntsville. When asked if he had ever been in the victim's house, the appellant told the witness, no, but that he had cut her yard. The witness also asked the appellant if he had opened a window when he was cutting the yard and the witness said, "no, that he talked to her in the front yard."
After this testimony, the defense rested, closing arguments were made, and the jury was instructed by the court. After deliberating, the jury returned its verdict and found the appellant guilty of robbery in the *Page 194 
first degree; burglary in the first degree; rape in the first degree; and theft in the first degree. After the jury was polled, the matter was deferred for sentencing.
At the sentencing hearing, proof of other felonies committed by the appellant was introduced by the State pursuant to the provisions of the Alabama Habitual Felony Offender Act. This proof indicated that on February 6, 1979, the appellant was adjudged guilty of the felony offense of buying, receiving, and concealing stolen property, in Jefferson County, Alabama; that appellant, on August 4, 1982, had been adjudged guilty of the felony offense of burglary in the third degree, also in Jefferson County, Alabama; and, that on June 25, 1981, before the Hamilton County Criminal Court, Chattanooga, Tennessee, the appellant had been adjudged guilty of the felony offense of sexual battery.
At this point, and against the advice of counsel, the appellant testified that, as to the present four convictions upon which sentence was to be pronounced, "on two of them cases, — I'm not guilty on that robbery and that rape." As to prior felony convictions in Alabama and Tennessee, the appellant, again over trial counsel's advice to remain silent, stated as follows:
 "MR. MOORE: On the one in Tennessee, I was running this place and this girl was under age and, you know, her mother found out about it, which I didn't know she was coming to my place.
 "THE COURT: Are you talking about the sexual battery conviction in Tennessee?
"MR. MOORE: Right.
 "THE COURT: What about the burglary conviction in Birmingham and the buying, receiving stolen property?
 "MR. MOORE: Well, I bought a stolen car, which I didn't know it was stolen in Birmingham. They got me for buying and receiving.
"THE COURT: How about the burglary?
 "MR. MOORE: I got caught in a car with a fellow that had stolen stuff in there. It come from a tire company, which I didn't know he had stole it from the tire company. He jumped out of the car and run and left me stuck with it.
 "THE COURT: But you were convicted in each of these three cases?
"MR. MOORE: Right.
 "THE COURT: And sentenced to the times as are indicated here?
"MR. MOORE: Right.
 "THE COURT: A year and a day, two years and three years, three separate felony convictions. Is there anything else that you wish to say?"
At this point, defense counsel intervened and stated, for the record, that he had advised his client to say nothing but that the appellant had decided that he would admit the validity of the three prior felony convictions. After the appellant stated that he did not have anything further to say, the trial court sentenced the appellant, in the robbery first degree, rape first degree, and burglary first degree cases, to life imprisonment without parole. As to the theft in the first degree charge, the court sentenced the appellant to life imprisonment. This appeal followed.
 I
The first issue raised by the appellant in this appeal is whether the State proved its case based upon circumstantial evidence. According to the appellant, the circumstantial evidence presented by the State was not sufficient and thus the trial court erred when it failed to grant the defense motion to exclude the evidence and dismiss the indictment at the end of the State's case. Of course, under Alabama law, circumstantial evidence is considered proper evidence. This court has repeatedly stated that the test which must be applied is not whether the circumstantial evidence excludes every reasonable hypothesis of guilt, but rather, whether a jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt. Davis v. State, 418 So.2d 959
(Ala.Cr.App. 1982); Jolly v. State, *Page 195 395 So.2d 1135 (Ala.Cr.App. 1981); Dolvin v. State, 391 So.2d 129
(Ala.Cr.App. 1980); Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Additionally, circumstantial evidence will support a conviction as strongly as direct evidence, provided that the circumstantial evidence points to the guilt of the accused. Andrews v. State,437 So.2d 661 (Ala.Cr.App. 1983); Davis, supra; Gullatt v. State,409 So.2d 466 (Ala.Cr.App. 1981). Based on the testimony outlined above, it is apparent that the State carried its burden of proof in presenting a prima facie case.
The main thrust of appellant's argument against the evidence concerns the fact that the victim did not see her assailant and could not identify his voice. In this case, however, the mere fact that the victim could not positively identify the appellant as her assailant does not mean that the State did not prove its case. See, for example, Carter v. State,405 So.2d 957 (Ala.Cr.App.), cert. denied, 405 So.2d 962 (Ala. 1981). The following significant factors linked the appellant to the crime and thus presented a jury question as to his guilt:
 1. Although the appellant told the investigating officers that he had never been inside the victim's house, a latent fingerprint taken on the inside of the window where the "point of entry" occurred matched the appellant's fingerprints.
 2. The appellant had had ample opportunity to observe the victim, her habits, her schedule and had been told, by the victim herself, that she would be "alone."
 3. The victim testified that her assailant was aware that she had a boyfriend, that her boyfriend spent a great deal of time with her, that her boyfriend lived out of town, that the victim had a job, and that the victim left for work in the morning.
 4. The victim was told by her assailant that he knew her but that she did not know him.
 5. Although the appellant had been living next door for approximately two weeks before the assault, neither the victim nor her roommates had associated with him and had never had him inside the house.
 6. The victim was threatened and cut by her assailant with a knife and a knife was found under the floormat of the victim's stolen car, which the appellant was driving.
 7. Although the appellant had been living for two weeks in the house next door to the victim, he disappeared the night of the assault and was arrested in Atlanta, Georgia, less than a week later.
 8. At the time the appellant was apprehended, less than a week later, in Atlanta, Georgia, he was driving the victim's stolen car.
 9. Although the appellant told the investigating officers that the car belonged to "Charles Watkins," this person could not be located.
Thus, the circumstantial evidence overwhelmingly pointed to the guilt of the accused.
Additionally, although the court did not have before it the evidence presented on behalf of the defense at the time that it ruled on the motion to exclude the State's evidence, it is apparent that the appellant had no defense, alibi or otherwise, to the charges. The only testimony presented by the appellant was that of two relatives: a wife whom he had not lived with for 14 years; and a relative of undisclosed kinship who lived next door to the victim. The testimony of the relative of undisclosed kinship did little, if anything, to establish the appellant's whereabouts on the night in question. In fact, she simply stated that she had seen him at the VFW Club between 3:30 and 4:30 in the afternoon and offered no testimony as to where the appellant might have been after that time. The appellant's wife merely testified that some time, perhaps in the month of May, she had called the police to forcibly remove the appellant from her house. Although the burden is on the State to present sufficient *Page 196 
evidence which would show that the accused is guilty of the offense as charged, it is evident that, in this case, the appellant was unable to defend or refute any of the charges made by the State.[3]
 II
The second issue raised by the appellant concerns certain testimony referred to in appellant's brief as "fingerprint expert testimony." According to the appellant, the testimony went to the "ultimate issue" of whether the fingerprints in the victim's home belonged to the appellant. At the trial court level, however, the specific objection made concerned the so-called "expert" qualifications of the witness. Since specific grounds of objection waive all grounds not specified, the trial court will not be put in error on grounds not specified. Hunt v. State, 453 So.2d 1083, 1088 (Ala.Cr.App. 1984).
Additionally, appellant failed to object to the testimony offered by the witness until after such time as the witness had identified the latent fingerprints as belonging to the appellant. Since no motion to exclude was made, the appellant failed to properly preserve this issue for review. Hunt v.State, supra; Reeves v. State, 456 So.2d 1156 (Ala.Cr.App. 1984); Hobbs v. State, 401 So.2d 276 (Ala.Cr.App. 1981).
For the reasons outlined above, it is apparent that the State presented a prima facie case of the offenses as charged in the indictment. Thus, the trial court correctly overruled the appellant's motion to exclude at the close of the State's evidence. Additionally, the appellant's second argument concerning certain testimony is also without merit. For these reasons, the decision of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] At a subsequent point in the testimony, it was revealed that the appellant's mother and stepfather lived next door to the victim.
[2] The victim testified that she was from Michigan and her car had Michigan license plates.
[3] Also note that at the time the appellant was sentenced for these four convictions, he told the Court that he was not guilty on "two of them cases," the robbery and rape. He did not profess innocence as to the other charges.