[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 549 
Anthony Ray Hinton was convicted of the capital murders of John Davidson and Thomas Wayne Vason, in violation of §13A-5-40(a)(2), Code of Alabama 1975, and was sentenced to death by electrocution for each conviction. Five issues are raised on appeal.
The two robbery-homicides which are the basis for the charges, which were brought under separate indictments, occurred on separate dates. The first robbery-homicide occurred on February 23, 1985, at Mrs. Winner's fried chicken restaurant, located at 737 29th Street, South, in Birmingham. This restaurant is approximately two and one-half blocks from the Red Mountain Expressway. Shortly after midnight on the morning of February 24, 1985, Thomas Elliott, an exterminator, arrived at Mrs. Winner's. Finding the door unlocked, Mr. Elliott entered the restaurant and called out. Mr. Elliott saw a light on in the back of the restaurant and headed toward it. Next to the cooler he found John Davidson, the restaurant's assistant manager, lying in a pool of blood. Mr. Davidson had been shot and was bleeding very badly. Mr. Davidson's false teeth were on the floor of the cooler. Blood was all over the door of the cooler. Mr. Elliott immediately called the 911 emergency number and summoned the Birmingham Police Department, as well as the rescue facilities of the Birmingham Fire Department, to the restaurant.
After assistance had been summoned, Mr. Davidson got up and started walking around the restaurant, but was unresponsive to Mr. Elliott's presence. Because he was frightened, Mr. Elliott went outside the restaurant to await the arrival of the paramedics. Moments later, the police and paramedics arrived, almost simultaneously. The paramedics administered emergency treatment to Mr. Davidson, then transported him to Medical Center East Hospital.
While the paramedics were attending Mr. Davidson, the police began their investigation of the incident. In the course of their investigation, the police determined that there was no sign of forced entry into the restaurant. However, the top of the safe was off and the safe was empty. A review of the restaurant's business records revealed that $2,100 was missing from the safe. No fingerprints were found at the scene. Mr. Davidson's truck was parked outside the restaurant and his wallet was on the front seat of the truck. Based on their investigation, the police concluded that Mr. Davidson, who had been alone in the restaurant, was accosted by an unknown gunman as he left the restaurant, forced to re-enter the restaurant, open the safe, and give the armed robber the cash contents of the restaurant's safe, and was then directed into the restaurant's cooler and shot twice in the head by the unknown robber.
Meanwhile, the victim, Mr. Davidson, was undergoing extensive surgery at Medical Center East, but to no avail; he died on February 25, 1985. During the course of the surgery, a .38 caliber bullet was removed from Mr. Davidson's head. This projectile was subsequently turned over to the Alabama Department of Forensic Sciences for its examination. Dr. Robert Brissie, chief coroner of Jefferson County, performed the autopsy on the victim. His examination revealed that Mr. Davidson suffered two gunshot wounds to the head. One bullet penetrated beneath his right eye and the other bullet entered approximately seven inches from the top of his head. Both wounds were to the right side of Mr. Davidson's face. It was Dr. Brissie's opinion that Mr. Davidson died as a result of gunshot wounds to his head. During the course of the autopsy, the second bullet was removed from the victim's head and turned over to the Department of Forensic Sciences for examination.
The second robbery-homicide occurred on July 1, 1985, at the Captain D's restaurant in Woodlawn, in the eastern section of Birmingham. This restaurant is located two to two and one-half blocks from the interchange of Interstate Highways 20 and 59. Earnest Horn left his job at Captain D's on the night of July 1, 1985, around 11:30 p.m., leaving the assistant manager, Thomas Wayne Vason, alone in the restaurant *Page 551 
counting the money taken in that day and preparing to call in his report of the day's sales to the Shoney's regional office. (Captain D's restaurants are a subsidiary of the Shoney's restaurant chain.) When Mr. Horn left the restaurant the alarm system was plugged into the phone. At approximately 12:45 a.m. on July 2, 1985, Mr. Vason called in his sales total to the regional office, then left the restaurant.
At 7:45 a.m. on July 2, 1985, Reuben Valdez, manager of the Captain D's in Woodlawn, arrived at the restaurant in preparation for the day's opening. He noticed Mr. Vason's car, but at the time thought nothing of it. Mr. Valdez entered the restaurant and saw that the safe was open. He then saw Mr. Vason's body lying in the cooler. Mr. Vason had been shot and appeared dead to Mr. Valdez. The police were immediately summoned. Mr. Valdez then called the area supervisor of Shoney's to report the crimes. Birmingham police officers first arrived at approximately 7:50 a.m. Additional investigators arrived shortly thereafter. Police found on the floor next to the open safe a piece of paper on which was written the combination to the safe. Mr. Vason's wallet was also found nearby on the desk; it contained $165 in bills of various denominations. A review of the business records revealed that $650 was missing from the safe. Additionally, the telephone alarm system was unplugged. There was, again, no sign of forced entry into the restaurant. The side kitchen door to the restaurant, the one nearest to the safe (on which a smudged fingerprint was found), could be opened only from the inside or the outside with a key. Mr. Vason's keys were found in the kitchen area. Based on their investigation, the police concluded that Mr. Vason, upon leaving the restaurant, was accosted by an unknown gunman and forced to re-enter the restaurant, open the safe, and give the armed robber the cash contents of the restaurant's safe, and then was directed into the restaurant's cooler and fatally shot twice in the head by the unknown robber.
Dr. Pat Garceau, a medical examiner in the Jefferson County Coroner's Office, determined that Mr. Vason was dead at the scene of the crime. Dr. Garceau's autopsy of the victim revealed that Mr. Vason had suffered two gunshot wounds to the head. One gunshot wound entered the right cheek of Mr. Vason, and the other entered one and one-half inches from the top of his head. Further testing performed on the victim by Dr. Garceau determined the time of death to be between 12:30 a.m. and 2:30 a.m. on July 2, 1985. It was Dr. Garceau's opinion that Mr. Vason's death was the result of a gunshot wound which penetrated his brain.
During the course of the autopsy, two .38 caliber bullets were recovered from the body of Mr. Vason. Both bullets were turned over to the Department of Forensic Sciences for its examination. The .38 caliber bullets which were recovered from the bodies of Mr. Davidson and Mr. Vason were later examined by firearms experts in the Department of Forensic Sciences to determine if they had been fired from the same weapon. Examination by these experts revealed that the bullets taken from the head of Mr. Davidson and the bullets recovered from the head of Mr. Vason were fired from the same weapon. Further similarities were present, in that both victims had been shot twice in the head, and both victims, at some time during the course of the robbery, were placed in the walk-in cooler of the restaurant. Moreover, during the investigation of both robberies, fingerprint technicians examined areas of the restaurant and were unable to find any latent fingerprints which could lead to the arrest of a suspect. Thus, without any further leads, the police department's investigation was at a standstill.
Later in the month of July, however, Birmingham police investigators working on these cases got their first big break. On July 25, 1985, Sidney Smotherman, who was a night manager of Quincy's Family Steak House restaurant in Bessemer, survived a robbery which fit the pattern of the Mrs. Winner's and Captain D's robbery-homicides. Mr. Smotherman told Bessemer police he was working the night shift at Quincy's in Bessemer on July 24, 1985. *Page 552 
Quincy's is located approximately four to five blocks from Interstate 59. Upon closing, however, several employees who were on the clean-up detail that night exited the building at the same time as Mr. Smotherman, approximately 12:14 a.m. on July 25, 1985. Mr. Smotherman got into his 1985 silver Pontiac Fiero and drove to the nearby Food World. Two other employees of Quincy's also stopped by Food World after work to pick up some items before going home for the night. One of the employees noticed a "strange looking guy" inside the store. The man seemed strange because he was not shopping and kept putting his hand up to his face in an apparent attempt to hide his face. This strange man did not make a purchase, but instead followed Mr. Smotherman outside the store. The receipt from Mr. Smotherman's purchases showed that Mr. Smotherman exited Food World at 12:26 a.m. on July 25, 1985.
After leaving Food World, Mr. Smotherman got into his car and began driving home. He had gone less than a mile down the road, when his car was bumped from the rear while he was stopped at a traffic light. Mr. Smotherman and the other driver, whom he identified as the defendant, got out of their cars to survey the damage. Having satisfied himself that there was no damage to his car, Mr. Smotherman got back into his car and prepared to drive off, but was prevented from doing so when the other man pulled a gun on him. The gunman ordered Mr. Smotherman to get into the front seat of the gunman's car, a large, dark-colored, mid-70's model. After parking Mr. Smotherman's car, the gunman walked back to his car carrying the gun and a white shirt or towel in his hand. He told Mr. Smotherman that he had been waiting for him and that he had to be in Atlanta in three hours.
The gunman then drove to Quincy's, pointed his gun at Mr. Smotherman, and told him they were going inside. Mr. Smotherman was ordered to get the gunman everything out of the safe except the pennies. After he had all the money, the gunman asked Mr. Smotherman where the cooler was located. Mr. Smotherman was then instructed to enter the cooler. Remembering from news accounts of the Mrs. Winner's and Captain D's robbery-homicides that the managers had been killed inside the coolers, Mr. Smotherman realized that this could be the same person and very likely he was going to be killed. He requested that the gunman put him in the storage room where the canned goods and vegetables were kept, as it was not as cold in that room. The gunman agreed to Mr. Smotherman's request and ordered him into the storeroom. As Mr. Smotherman walked into the room, he turned and saw the gunman pointing a pistol at his head. He ducked and threw his hands up just as two shots were being fired. As he was falling, he kicked the door shut, and as it closed it locked automatically, thus preventing the robber from coming into the room. One of the bullets hit Mr. Smotherman in the finger and then grazed his head. After waiting about ten minutes, Mr. Smotherman left the storeroom, went next door to the Motel 6, and called the police. Mr. Smotherman was taken to the hospital for treatment. While medical personnel were examining and treating Mr. Smotherman's injuries, they discovered that one of the bullets fired at him by the robber had ricocheted off of something and fallen into his shirt pocket. This bullet, along with the bullet recovered from the storeroom, was turned over to the Department of Forensic Sciences for its examination. Upon examination, it was determined by the forensic experts that these two bullets were fired from the same weapon that had fired the bullets which caused the deaths of John Davidson and Thomas Wayne Vason.
Police investigators could not lift any fingerprints from Mr. Smotherman's car or from inside the restaurant. Mr. Smotherman was, however, able to provide police with a detailed description of the robber and assisted in constructing a composite drawing of the suspect. On July 30, 1985, Mr. Smotherman was shown a photographic array, and within a few seconds he picked up the defendant's photograph and stated, "This is him." At trial Mr. Smotherman identified the defendant as the gunman who robbed and then shot him. Mr. *Page 553 
Smotherman's co-worker also identified the defendant Anthony Ray Hinton as the "strange" man he had seen in Food World just minutes before the robbery/shooting.
Police investigators also discovered that approximately two weeks before the Quincy's robbery, the defendant had approached Reginald White, an employee of Quincy's in Bessemer, in Hoover at the location of his second job. Mr. White had not seen the defendant in some four years. At the time they had last seen each other, the defendant was a frequent patron of Quincy's. The defendant asked Mr. White if he was still working at Quincy's. Mr. White replied, "yes." The defendant also asked if "Mr. Don" was the manager. Mr. White replied no, that the Quincy's in Bessemer had a new manager who had just bought a new Fiero. The defendant also inquired as to what time the restaurant closed.
On July 31, 1985, Sergeant Clyde Amberson of the Jefferson County Sheriff's Department went to the defendant's home in Walker county. Sergeant Amberson was accompanied by an investigator from the Walker County District Attorney's Office. The defendant was informed that they had a warrant for his arrest, placed him under arrest on a robbery charge, and informed him of his Miranda rights. The defendant gave permission for his car and his bedroom to be searched. No incriminating evidence was found in either place. Sergeant Amberson asked defendant's mother if she had a gun in the house. She answered affirmatively. However, when she opened the kitchen drawer to get the gun, it was gone. She then went into the back bedroom and returned with a pistol. Mrs. Hinton gave the officers the gun and two bullets taken from the gun.
The gun given to police investigators by the defendant's mother, a .38 caliber Smith Wesson pistol, was turned over to the State Department of Forensic Sciences for its examination. As has been previously stated, two bullets were fired at each of the three victims involved in the aforementioned robberies. Each of these bullets was recovered and turned over to the Department of Forensic Sciences for examination. Expert examination of these bullets established that all six of the bullets were fired through the same weapon. The gun recovered at the defendant's home was test-fired by these same forensic experts and it was determined that this was the weapon through which all of the bullets recovered from these three robbery investigations were fired. The defendant was then arrested and charged with capital murder in the deaths of John Davidson and Thomas Wayne Vason.
The defendant maintained that at the time of the Quincy's robbery he was at his job at the Bruno's warehouse in Ensley, and at trial he presented testimony to that effect. Further testimony was presented by the defendant himself, who denied any involvement with any of the three incidents. The defense also called expert witness Andrew Payne, a consulting engineer with some expertise in firearms identification. Mr. Payne stated that he examined each of the bullets recovered from the three incidents and the weapon recovered from the defendant's home. It was his conclusion that no determination could be made that the bullets had been fired from that weapon.
 I
The defendant first contends that the trial court committed reversible error by consolidating the two cases for trial, and then by not granting his motion to sever made at the conclusion of the trial.
Rule 15.3 of our Rules of Criminal Procedure states the following with respect to the joinder or consolidation of offenses:
 "(a) Joinder. Two or more offenses may be jointed in an indictment, information, or complaint, if they:
"(i) are of the same or similar character; or
 "(ii) are based on the same conduct or are otherwise connected in their commission; or
 "(iii) are alleged to have been part of a common scheme or plan.
 "Offenses shall not be joined in the same count of an indictment or information. Felonies and misdemeanors may be *Page 554 
joined in separate counts of the same indictment or information.
 "(b) Consolidation. If a defendant has been charged in separate indictments, informations, or complaints, the court, on its own initiative or on motion of either party, may, not later than seven days prior to trial, order that the charges be tried together if the offenses could have been joined in a single indictment, information, or complaint. Proceedings thereafter shall be the same as if the prosecution initially had been under a single indictment, information, or complaint. However, the court shall not order that the offenses be tried together without first providing the defendant and the prosecutor an opportunity to be heard."
Our rule on joinder and consolidation of criminal offenses is similar to Rule 8(a) of the Federal Rules of Criminal Procedure. Langham v. State, 494 So.2d 910, 915 (Ala.Cr.App. 1986). Rule 8(a), Fed.R.Crim.P., provides in pertinent part as follows:
 "Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan."
Additionally, Rule 13, Fed.R.Crim.P., states that "The court may order two or more indictments . . . to be tried together if the offenses . . . could have been joined in a single indictment." Because this state's joinder rules are based on the federal joinder rules, we have, in effect, adopted these federal rules. It is settled law in this state that when the legislature adopts a federal statute, it also adopts the construction which the federal courts have placed on that statute. Ex parte Huguley Water System, 282 Ala. 633,213 So.2d 799, 804 (1968). See also Committee Comment to Rule 1, Ala.R.Civ.P.
Clearly, joinder of two classes of offenses of the same or similar character is correct. United States v. Cartwright,632 F.2d 1290, 1293-94 (5th Cir. 1980); Crawford v. State,485 So.2d 391, 394 (Ala.Cr.App. 1986). Joinder of offenses is also correct where the counts so joined refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps. United States v.Shearer, 606 F.2d 819, 820 (8th Cir. 1979). Moreover, the rule permitting joinder is not limited to crimes of the "same" character, but also covers those of "similar character," which means nearly corresponding, resembling in many respects, or having a general likeness. United States v. Werner,620 F.2d 922, 926 (2d Cir. 1980). See also 2 LaFave and Israel,Criminal Procedure § 17.1(a), (b) (1984).
Our examination of the evidence in the case at bar convinces us that consolidation of these offenses was correct. Both of these crimes were of the same or similar character, that is, they were robberies of fast food restaurants and murders of the night managers. Both crimes took place generally in the same part of Birmingham. Both crimes were committed at restaurants located near a major expressway or interstate. Both crimes occurred late at night when the night managers were alone at the restaurant. Both crimes were committed by someone who waited until the night manager closed the restaurant and left the building, and who then forced the night manager to unlock the restaurants, thus leaving no sign of a forced entry. Both crimes were committed by someone who was cunning enough to leave no fingerprints. Both crimes were committed by someone who was after large amounts of cash, such as those found in the restaurants' safes, and who left the victims' wallets untouched. Both crimes were committed by someone who forced the night managers into the restaurants' coolers and then shot the managers twice in the head to kill them. Finally, both crimes were committed with the same .38 caliber gun. It is obvious that the defendant had a common plan, which was to rob fast food restaurants, put the manager in the cooler and then kill him, thus leaving no witnesses and no fingerprints from which he could be *Page 555 
identified. Indeed, as we have stated in Crawford v. State,supra, 485 So.2d at 394, "the case at bar is a 'classic case' for joinder."
We must now consider, however, if the consolidation of these two cases, while proper, was so prejudicial as to deprive the defendant of a fair trial.
The grounds for severance of consolidated indictments are stated in Rule 15.3(d), A.R.Crim.P.Temp., which provides as follows:
 "(d) Severance grounds. If the court finds that by a joinder of offenses in an indictment, information, or complaint, or by consolidation for trial, as provided in this rule, a defendant or the state may be prejudiced to the extent that a fair trial cannot be afforded, the court shall order an election or separate trials of counts or charges or provide whatever other relief justice may require. Without a finding of prejudice, however, the court may, with the agreement of the parties, order an election or separate trials of counts or charges."
This rule is again taken from the Federal Rules of Criminal Procedure. Rule 14 of those rules states in pertinent part: "If it appears that a defendant . . . is prejudiced by a joinder of offenses . . . the court may order separate trials . . . or grant whatever other relief justice requires."
The burden of proof is on the defendant to demonstrate specific and compelling prejudice which the trial court cannot protect against and which causes him to receive an unfair trial. United States v. Butera, 677 F.2d 1376, 1385 (11th Cir. 1982), cert. denied, 459 U.S. 1108, 103 S.Ct. 735,74 L.Ed.2d 958 (1983). It is only the most compelling prejudice, against which the trial court will not be able to afford protection, that will be sufficient to show the court abused its discretion in not granting a severance. United States v. Perez,489 F.2d 51, 65 (5th Cir. 1973), cert. denied, 417 U.S. 945,94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Moreover, a defendant seeking to overturn a denial of severance must demonstrate specific prejudice which resulted from the denial. United States v.Walker, 456 F.2d 1037, 1039 (5th Cir. 1972). A mere showing of some prejudice is insufficient. United States v. Wilson,657 F.2d 755, 765 (5th Cir. 1981), cert. denied, 455 U.S. 951,102 S.Ct. 1456, 71 L.Ed.2d 667 (1982); United States v.Staller, 616 F.2d 1284, 1294 (5th Cir.), cert. denied,449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980).
 "With respect to prejudice of the defendant, it is [generally] likely to fall into one of three categories: '(1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately it would not so find.' "
2 LaFave and Israel, supra, Criminal Procedure at § 17.1(c). However, the existence of alleged prejudice from consolidation of indictments for trial is dependent upon particular facts and circumstances of each case and must be weighed against the interests of trial convenience and economy of judicial and prosecutorial resources. United States v. Werner, supra,620 F.2d at 928; Smith v. United States, 357 F.2d 486, 489 (5th Cir. 1966); Glanton v. State, 474 So.2d 154, 155 (Ala.Cr.App. 1984), rev'd on other grounds, 474 So.2d 156 (Ala. 1985).
As the defendant's defense to both charges was the same, i.e., mistaken identity, there was no chance that he could have become embarrassed or confounded by presenting separate defenses. Moreover, where, as in the instant case, the nature of the offenses or of the evidence is not of such a character or is not so complicated that a jury could not reasonably be expected to separate the indictments and to evaluate the evidence properly and individually on each separate charge, the severance motion is due to be denied. United States v. Harris,458 F.2d 670, 673 (5th Cir.), cert. denied, 409 U.S. 888,93 S.Ct. 195, 34 L.Ed.2d 145 (1972). Neither does *Page 556 
mere speculation that the jury will not follow the instructions of the trial court with respect to compartmentalizing the evidence justify a severance. United States v. Borish,452 F. Supp. 518, 524 (E.D.Pa. 1978). Nor is severance justified on the grounds that the jury will cumulate evidence introduced on all counts unless prejudice flowing from consolidation of the indictments is clearly beyond the curative powers of cautionary instructions by the trial court. United States v. Morrow,537 F.2d 120, 136 (5th Cir. 1976), cert. denied, 430 U.S. 956,97 S.Ct. 1602, 51 L.Ed.2d 806 (1977).
In the instant case we find that the defendant has failed to demonstrate the requisite specific and compelling prejudice as a result of the joint trial of the two indictments, especially in light of the fact that had these two cases been tried separately, in each trial evidence of the other charged crime would have been admissible under the plan, design, scheme, or system and identity exception to the general exclusionary rule.Nicks v. State, 521 So.2d 1018, 1025-28 (Ala.Cr.App. 1987),aff'd, 521 So.2d 1035 (Ala. 1988). Therefore, as identity would have been at issue in each crime, evidence of the other charged crime would have been admissible to shed light on the identity of the perpetrator of the charged crime. We note that the defendant's contention that evidence of the other charged crime would not have been admissible because his identity was "not established without dispute" in either case must fail because a defendant's involvement or guilt of other crimes unrelated to the crime charged need not be proved beyond a reasonable doubt for such to be admissible. Smith v. State, 401 So.2d 185
(Ala.Cr.App.), cert. denied, 401 So.2d 187 (Ala. 1981). Accord,United States v. Mitchell, 666 F.2d 1385, 1389 (11th Cir.),cert. denied, 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1340
(1982).
Furthermore, even if the evidence of the other charged crime could not be admitted because defendant's identity as the perpetrator was based on circumstantial evidence in both, it would have become admissible as soon as the State introduced evidence of the third (and non-charged) crime — the Quincy's incident. While we are well aware of the general exclusionary rule preventing the introduction of evidence of crimes not charged in the indictment, C. Gamble, McElroy's AlabamaEvidence § 69.01(1) (3d ed. 1977), there is no question that the Quincy's incident would be admissible in a trial for either the Mrs. Winner's or the Captain D's crime whether these cases were tried together or separately. Nicks v. State, supra,521 So.2d at 1025-28. The law is quite clear that the evidence of the Quincy's incident and the defendant's commission thereof would have been admissible in either case under the plan, design, scheme, or system and identity exceptions to the general exclusionary rule. "Evidence of the accused's commission of another crime is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime[s] and such other crime were committed in keeping with or pursuant to a single plan, design, scheme, or system, whether narrow or broad in scope."McElroy's, supra, at § 69.01(6). The identity exception "contemplates the situation where the now-charged crime[s] was committed in a novel and peculiar manner and that the state is allowed to show that the accused has committed other similar offenses, in the same novel and peculiar manner, in order to show him to be the perpetrator of the now-charged crime[s]."McElroy's, supra, at § 69.01(8).
In the instant case, there are certain similarities in the charged crimes and the subsequent robbery-attempted murder. All three were committed in the Birmingham area at fast food restaurants that were near a major expressway or interstate. Each incident had the same modus operandi. They all occurred late at night when only the night manager was in the restaurant. The robber waited outside the building until the night manager closed the restaurant and exited the building, and then forced the night manager to unlock the restaurant, leaving no sign of a forced entry. No fingerprints were left at any of the restaurants. In each incident the manager, after opening the restaurant's safe *Page 557 
and giving the robber the cash inside, was ordered into the restaurant's cooler to be shot twice in the head with a .38 caliber pistol. The same pistol was used in all three incidents and it was recovered at the defendant's residence.
Admittedly, there is one major difference between the now-charged crime and the Quincy's incident, i.e., the night manager of Quincy's survived the incident and was able to identify the defendant as the robber. This was due, however, to the quick thinking of the manager and no small amount of "just plain luck" on the part of Mr. Smotherman, the Quincy's manager. Thus, the evidence pertaining to the Quincy's crime was clearly relevant to the now-charged crimes.
Because of the similarities between the three incidents, evidence of the Quincy's crime was admissible to identify the defendant as the person who committed the robbery-homicides at Captain D's and Mrs. Winner's. Therefore, regardless of whether the Captain D's and Mrs. Winner's incidents were tried separately or together, the Quincy's incident was admissible into evidence. Then, there is no question that if there had been separate trials, as soon as the Quincy's evidence was admitted, the evidence of the other crime (either Captain D's or Mrs. Winner's) would have been admissible under the aforementioned exceptions to the exclusionary rule. Thus, the fact that these two incidents were tried together in no way prejudiced the defendant. Drew v. United States, 331 F.2d 85,90 (D.C. Cir. 1964). Therefore, the trial court was correct in first consolidating these offenses for trial, and later in denying defendant's request for severance.
 II
Issues two and three of the defendant's brief relate to whether the State's failure to introduce into evidence the test bullets used by expert witnesses David Higgins and Lawden Yates in their analysis of the six bullets involved in the case at bar constituted reversible error.
We initially note that defense counsel's objections during the testimony of these two witnesses were inadequate to preserve error. During the testimony of Higgins, defense counsel's only objection was "We object. May I see something?" Because specific objections are necessary to preserve error, this general objection preserved nothing for our review.Meadows v. State, 473 So.2d 582, 587 (Ala.Cr.App. 1985);Campbell v. State, 449 So.2d 1272, 1273 (Ala.Cr.App. 1984);Smoot v. State, 381 So.2d 668, 671 (Ala.Cr.App. 1980). The defendant does assert in his brief that an off-the-record discussion took place during which he objected to the State's failure to introduce the test bullets. This discussion, however, does not appear in the record and, therefore, is not before this court, as this court's review is limited to matters of record. Fuller v. State, 472 So.2d 452, 454 (Ala.Cr.App. 1985); Moore v. State, 457 So.2d 981, 989 (Ala.Cr.App. 1984),cert. denied, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820
(1985); Hollins v. State, 415 So.2d 1249, 1252 (Ala.Cr.App. 1982). Likewise, during the testimony of Lawden Yates, no objection was made as to the State's failure to introduce the test bullets. The only objection made during Yates's testimony was one which alleged hearsay. Such an objection does not preserve this issue for our review, as a specific objection waives all grounds not specified. Murray v. State,494 So.2d 891, 893 (Ala.Cr.App. 1986); Breedlove v. State,482 So.2d 1277, 1282 (Ala.Cr.App. 1985); Moore v. State, 474 So.2d 190,196 (Ala.Cr.App. 1985). Thus, this issue was not preserved at trial.
However, defendant's failure to preserve this issue, "while weighing against defendant as to any possible claim of prejudice, serves as no impediment to our scope of review pursuant to the 'plain error' mandate in death penalty cases."Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied,464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Therefore, we must now consider whether the State's failure to introduce the test bullets into evidence constituted "plain error." Our Supreme Court has adopted federal case law defining plain error, holding that "[p]lain error only arises if the error is so obvious that the *Page 558 
failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack,435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986,104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Ex parte Harrell,470 So.2d 1309, 1313 (Ala.), cert. denied, 474 U.S. 935,106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
Our review of the record convinces us that the failure to introduce the test bullets into evidence did not seriously affect the fairness of the proceedings against defendant. Indeed, we are reluctant to even consider that this could constitute error of any sort. The two test bullets were simply a tool used by the expert witnesses in analyzing the pieces of evidence (six bullets and a pistol) he was asked to examine. These bullets were not evidence in the case but, rather, were only an aid used in examining the evidence, just as is a microscope. The two test bullets would have been admissible, but it is not error that they were not offered.
Moreover, introduction of the test bullets into evidence would not have aided the jury's deliberations in any way. The markings on the bullets could only be seen with the aid of a comparison microscope, and not with the naked eye. Even if these bullets had been admitted into evidence and taken by the jury into the jury room, the jurors could have seen nothing but a bullet. They could not have seen the markings on either the test bullets or the six bullets in evidence, much less made any comparisons between them. This was clearly a matter for firearms experts and, thus, the jury had to rely upon the experts' findings. We note that both the State and defense expert witnesses had access to these test bullets when making their findings. Therefore, we find that the defense was in no way harmed because the jurors did not actually handle the test bullets. Thus, no "plain error" occurred because these test bullets were not introduced into evidence.
 III
The defendant next contends that the evidence adduced at trial was insufficient to support his convictions for capital murder. Specifically, Hinton contends that the State failed to present any direct evidence which linked him to the murders of John Davidson and Thomas Wayne Vason.
We first note that the mere fact that evidence is of a circumstantial nature does not make it deficient; circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused. Linzy v. State, 455 So.2d 260, 262 (Ala.Cr.App. 1984). The test of the sufficiency of circumstantial evidence is not whether the possibility exists that someone other than the accused committed the crime, but rather whether the evidence excluded every reasonable hypothesis but that of the accused's guilt. Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App. 1978),cert. denied, 368 So.2d 877 (Ala. 1979). Viewing the State's evidence presented to the jury, which is set out above, under the principles enunciated in Cumbo, supra, we find that when viewed in the light most favorable to the prosecution, it was sufficient to allow the jury to reasonably find that the evidence excluded every reasonable hypothesis except that of the defendant's guilt. The State's evidence established the following: Two robbery-murders and one robbery-attempted murder were committed in the Birmingham area. All three incidents had the same modus operandi. The same weapon was used in each incident. The weapon identified by experts in firearms identification as the one through which the bullets recovered during the police investigation of these three incidents were fired was given to a police investigator by the defendant's mother, and was a weapon to which the defendant had access. Moreover, the victim in the robbery-attempted murder incident positively identified the defendant as the individual who forced him at gunpoint to re-enter Quincy's, open the safe, and give him all the money and who then pointed a weapon at his head and fired twice. Clearly, the evidence was inconsistent with any reasonable theory of innocence. Indeed, all material circumstances in the evidence point to the defendant's guilt. Thus, we find that the evidence presented at trial *Page 559 
was sufficient to sustain the defendant's conviction.
 IV
The defendant further contends that notwithstanding the current state of the law with respect to the admissibility of polygraph examination results, he should have been permitted to introduce both at the guilt phase and the sentencing phase of his trial the results of his polygraph examination which tended to indicate that he had nothing to do with either of the murders.
The law in Alabama with regard to the admission of polygraph evidence is as follows:
 "[T]he results of polygraph examinations are, in general, inadmissible in Alabama. Stewart v. State, 398 So.2d 369 (Ala.Cr.App. 1981). They are admissible, however, upon stipulation of the parties, subject to certain conditions which relate to the accused's knowledge of his rights thereunder and the trial court's discretion relating to the conduct of the test itself. See Wynn v. State, 423 So.2d 294, 299-300 (Ala.Cr.App. 1982). Nothing in that case, however, nor in any other Alabama case to which we have been cited, requires the prosecutor's consent to an offer of the accused to stipulate to the admission of the results of the accused's polygraph examination. As yet, Alabama has not adopted the premise of Wisconsin that such tests have achieved such a degree of reliability and scientific recognition 'that their unconditional rejection is no longer appropriate.' McMorris, [v. Israel] 643 F.2d [458] at 465 [(7th Cir. 1981)]."
Ex parte Clements, 447 So.2d 695, 698 (Ala. 1984). In the instant case the prosecutor refused to stipulate to the admission of the results of a polygraph examination performed on the defendant. Under Alabama law, he was perfectly within his rights to so refuse. Therefore, the trial court correctly refused to admit these test results into evidence during the guilt phase of defendant's trial.
The question of whether the results of a polygraph examination may be admitted into evidence during the sentencing phase of a defendant's bifurcated trial, however, is one of first impression in this State. We note that this issue was raised, but not addressed by this court, in Tarver v. State,500 So.2d 1232 (Ala.Cr.App.), aff'd, 500 So.2d 1256 (Ala. 1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3197,96 L.Ed.2d 685 (1987).
The admissibility of evidence in a capital sentence proceeding under this state's 1981 murder statute is controlled by § 13A-5-45(d), Code of Alabama 1975, which provides as follows:
 "Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the state of Alabama." (Emphasis added.)
After much deliberation, we find the results of a polygraph test to be neither probative nor relevant in the instant case.
The results of a polygraph test have no probative value for two reasons. First, polygraph test results are not probative because the premise on which polygraph examinations are based, i.e., that a machine can reflect whether a person's responses are deceptive, has not been sufficiently established. Ex parteDolvin, 391 So.2d 677, 679 (Ala. 1980); Wynn v. State,423 So.2d 294, 296 (Ala.Cr.App. 1982). In other words, because polygraph examinations cannot reliably prove what they are supposed to prove, testimony regarding the results of those tests is not probative and is therefore due to be excluded under § 13A-5-45(d). Second, polygraph test results are not probative because the admission of these test results tends to distort the truth-finding process. While we in the legal community are well aware of the lack of established reliability of polygraph examinations, members of a jury may not be so well informed. As this court has recognized, *Page 560 
there is a danger that the jury will be over-awed by the opinion of a polygraph examiner. Wynn v. State, supra,423 So.2d at 297-99. Therefore, the uncritical acceptance of polygraph results tends to induce a jury to reject other evidence which is in fact more reliable.
Accordingly, the courts of several other jurisdictions have held that the results of polygraph examinations are not admissible in capital sentence proceedings. Hendrickson v.State, 285 Ark. 462, 688 S.W.2d 295, 297-98 (1985); People v.Szabo, 94 Ill.2d 327, 68 Ill.Dec. 935, 952, 447 N.E.2d 193, 210
(1983), affirmed on remand, 113 Ill.2d 83, 100 Ill.Dec. 726,497 N.E.2d 995 (1986), cert. denied, 479 U.S. 1101,107 S.Ct. 1330, 94 L.Ed.2d 181 (1987); State v. Copeland, 278 S.C. 572,300 S.E.2d 63, 69, cert. denied, 460 U.S. 1103, 103 S.Ct. 1802,76 L.Ed.2d 367 (1983). See also State v. Craig, 308 N.C. 446,302 S.E.2d 740, 749, cert. denied, 464 U.S. 908, 104 S.Ct. 263,78 L.Ed.2d 247 (1983) (request by convicted defendant to take polygraph examination correctly refused because such a request has no relevance to question before jury at sentencing stage of trial). Thus, for the reasons cited above, this court finds the results of polygraph examinations non-probative and therefore inadmissible in the defendant's capital sentencing proceedings.
Neither do we find the results of a polygraph examination material to the issues considered at the sentencing hearing. Here, the polygraph test results indicated that the defendant did not commit the crimes for which he had already been convicted. In a sentencing hearing, however, the jury considers only evidence of aggravating and mitigating circumstances, and not questions of guilt or innocence.
There is but one aggravating circumstance to which polygraph evidence could relate in this case; i.e., that the capital offense occurred while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery. § 13A-5-49(4),Code of Alabama 1975. Although the defendant could argue that the results of his polygraph examination tended to disprove this aggravating circumstance because the results showed that the defendant committed no crime at all, such an argument would be futile in light of § 13A-5-45(e), Code of Alabama 1975, which reads as follows:
 "At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." (Emphasis added.)
Since the aforementioned aggravating circumstance had already been conclusively established by the verdict finding defendant guilty of two counts of robbery-homicide, admission of the results of defendant's polygraph examination would have served no useful purpose here.
Nor would the results of the polygraph examination be relevant to the sentencing proceeding as a nonstatutory mitigating circumstance. The scope of non-statutory mitigating circumstances is set out in § 13A-5-52, Code of Alabama 1975, which provides as follows:
 "In addition to the mitigating circumstances specified in section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."
We interpret this section to limit mitigating evidence to that which assumes that the defendant committed the crime for which he was convicted. If not, the sentence hearing could turn into a relitigation of the trial on guilt, effectively nullifying § 13A-5-45(e). This court therefore finds that polygraph results which indicate that the defendant is not guilty of the crime for *Page 561 
which he is being sentenced are not relevant to either aggravating or mitigating circumstances and thus are inadmissible in a sentencing proceeding under § 13A-5-45(d).
Moreover, our decision with regard to this issue does not violate the rule of Lockett v. Ohio, 438 U.S. 586,98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In Lockett, the Supreme Court, reviewing the constitutionality of an Ohio capital statute which limited the manner in which a defendant's background and character could be considered in sentencing, concluded that the sentencing authority in a capital case could not be precluded from considering as a mitigating factor any aspect of a defendant's character or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. 438 U.S. at 604, 98 S.Ct. at 2964. However, that Court made clear in a footnote to the opinion the extent of its holding, stating as follows:
 "Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."
Id. at n. 12. This footnote, with its use of the phrase "his offense," clearly indicates that Lockett was not intended to be, nor should it be interpreted as, an open door to a relitigation of the issues already decided by the jury's verdict. Under Lockett, therefore, the results of polygraph examinations which, like those in the instant case, suggest that the defendant was not guilty of the crime for which he has already been convicted may be excluded as irrelevant to the issue of his sentence. Furthermore, as recognized by the Eleventh Circuit Court of Appeals in the case of Thompson v.Wainwright, 787 F.2d 1447, 1457-58 (11th Cir. 1986) cert.denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987), while Lockett entitles a capital defendant to introduce any relevant evidence at the sentence hearing, it does not require that a state abandon its rules of evidence as to the competency of that evidence. Therefore, it also stands to reason thatLockett does not require states to disregard their exclusionary rules based on the non-probative and misleading nature of testimony. As discussed above, the results of polygraph examinations are not probative because polygraph examinations have not been shown to accurately detect deception, and are misleading because juries often assume that they are conclusive.
We do note that one jurisdiction has indicated thatLockett requires the admission in capital sentence proceedings of polygraph results which reflect on the circumstances of the crime. State v. Bartholomew, 101 Wn.2d 631, 683 P.2d 1079,1088-89 (1984). The holding in Bartholomew, however, is based on an incomplete reading of Lockett, as the Supreme Court of Washington cited only the textual language in Lockett, while omitting what we view as the equally important footnote. Moreover, Bartholomew is factually distinguishable from the case at bar. In Bartholomew, the polygraph results at issue were not the defendant's, but those of a key prosecution witness who had testified at the guilt phase that he was present at the crime but did not participate. The polygraph results suggested that the witness had been lying about the degree of his involvement in the crime. Unlike in the instant case, this evidence did not necessarily tend to absolve the defendant of guilt, but rather suggested that he was not acting alone, a factor which might properly be considered as a mitigating circumstance.
Therefore, based on the reasons stated above, we decline to create an exception to the general rule prohibiting the admission of polygraph results, except by stipulation of the parties, in the sentencing phase of bifurcated trials for the same reason that such evidence is generally inadmissible — its questionable reliability for scientific accuracy.
 V
As required by Beck v. State, 396 So.2d 645 (Ala. 1980), and § 13A-5-53, Code of Alabama 1975, we have reviewed this case for any error involving the conviction and the propriety of the death sentence. *Page 562 
We have searched the entire record for any plain error or defect which might have adversely affected the defendant's substantial rights and have found none. A.R.A.P., Rule 45A.
There has been no argument made by the defendant that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and there is no evidence to support any such contention.
Our review of the sentence proceedings reveals that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. The trial court found the existence of only one aggravating circumstance: that the capital offenses were committed while the defendant was engaged in the commission of a robbery, § 13A-5-49(4). Also, included in the trial court's findings, but not considered as an aggravating circumstance, was the fact that the defendant had been convicted of three prior felony offenses and was on parole at the time of the commission of these offenses. This failure to consider this finding as an aggravating circumstance was erroneous, as we have held in Tarver v. State,500 So.2d 1232, 1250-51 (Ala.Cr.App.), aff'd, 500 So.2d 1256 (Ala. 1986),cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685
(1987), that the aggravating circumstance that the defendant was under a sentence of imprisonment at the time of the crime is present when a defendant is on parole. However, such error was harmless as the omission of this aggravating circumstance in no way injuriously affected the substantial rights of the defendant. A.R.A.P., Rule 45A. The trial court found the existence of no mitigating circumstances. This finding was also supported by the evidence.
Our independent weighing of the aggravating and mitigating circumstances convinces this court of the propriety of the death sentence.
Moreover, we are convinced that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Indeed, fully two-thirds of Alabama death sentences have been imposed on defendants convicted of capital murder arising out of robbery-homicides. Beck v. State, supra, 396 So.2d at 654 n. 5; see also, e.g., Bell v. State, 475 So.2d 601 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609 (Ala. 1985), cert. denied,474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Jones v. State,456 So.2d 366 (Ala.Cr.App. 1983), aff'd, 456 So.2d 380 (Ala. 1984),cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838
(1985). The judgment of the trial court is therefore due to be affirmed.
AFFIRMED.
All the Judges concur.