706 So.2d 828 (1997)
Willie McNAIR
v.
STATE.
CR-95-0470.
Court of Criminal Appeals of Alabama.
July 3, 1997.
Opinion Supplementing Decision on Overruling Rehearing August 22, 1997.
Certiorari Denied November 21, 1997.
Certiorari Denied April 6, 1998.
*831 Randall S. Susskind and Bryan A. Stevanson, Montgomery, for appellant.
Bill Pryor, atty. gen., and John Gibbs, asst. atty. gen., for appellee.
Alabama Supreme Court 1961963.
Certiorari Denied April 6, 1998. See 118 S.Ct. 1396.
PATTERSON, Retired Appellate Judge.
This is an appeal from the denial of a petition for post-conviction relief, Ala. R.Crim.P. 32. On July 12, 1990, the appellant, Willie McNair, was indicted for the capital offense of murder committed during a robbery in the first degree or an attempt thereof, a violation of § 13A-5-40(a)(2), Code of Alabama 1975. On April 18, 1991, he was found guilty after a jury trial of the capital offense charged in the indictment. The jury, *832 by a vote of 10 to 2, recommended a sentence of death, and on May 16, 1991, the trial court, adopting the recommendation of the jury, sentenced the appellant to death. On July 24, 1992, on direct appeal, we remanded the case to the trial court for new sentencing proceedings before the jury and the trial court because we determined that evidence of the appellant's prior Florida conviction based upon a plea of nolo contendere had been improperly admitted and considered in the sentencing proceedings. McNair v. State, 653 So.2d 320 (Ala.Cr.App.1992).
On January 25-28, 1993, a new sentencing proceeding was held before a new jury, after the appellant's motion for a change of venue had been granted and the case had been transferred to Montgomery County. In this proceeding, the jury recommended a sentence of life imprisonment without the possibility of parole by a vote of eight to four. On February 26, 1993, after a separate sentencing hearing before the trial court, the trial court rejected the jury's recommendation and sentenced the appellant to death. The circuit court filed its return to remand on April 23, 1993. Finding (1) that the trial court's new sentencing order was deficient because it did not fully comply with the appropriate statutes and because it was incomplete, and (2) that the record did not contain a presentence report, we again remanded the case to the trial court on August 13, 1993, with instructions to reconsider its sentence determination; to enter a new sentencing order, making specific written findings on the existence or nonexistence of each statutory aggravating and mitigating circumstance[1] and on any additional nonstatutory mitigating circumstance and stating the reasons if appropriate why any aggravating circumstance or circumstances outweighed any mitigating circumstances; and to supplement the record on appeal with the presentence report. McNair v. State, 653 So.2d 343 (Ala. Cr.App.1993).
The trial court, in response to our second remand, entered an amended sentencing order on August 18, 1993, and filed a return to our remand on August 23, 1993. This amended order only partially complied with our remand, and we remanded the case a third time on September 30, 1993, again instructing the trial court to enter a proper and correct sentencing order as required by statute and by our prior remand. McNair v. State, 653 So.2d 347 (Ala.Cr.App.1993).[2] On October 6, 1993, the trial court entered yet another sentencing order, and filed its return to remand on October 14, 1993. Its new sentencing order complied with our instructions, and on January 21, 1994, we affirmed the appellant's conviction and sentence of death. McNair v. State, 653 So.2d 351 (Ala. Cr.App.1994). The Alabama Supreme Court affirmed the conviction and death sentence on September 2, 1994. Ex parte McNair, 653 So.2d 353 (Ala.1994). On February 21, 1995, the United States Supreme Court denied the appellant's petition for certiorari review. McNair v. Alabama, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).
*833 The appellant filed his post-conviction petition in Henry County pursuant to Rule 32 on July 5, 1995. On July 27, 1995, the district attorney filed a motion for summary disposition. On August 1, 1995, the attorney general filed an answer to the petition and a motion for partial dismissal as to those claims that he said were procedurally barred and insufficiently pleaded. On August 3, 1995, the circuit court granted the attorney general's motion for partial dismissal. On August 24, 1995, the appellant filed an amendment to his petition. On August 30, 1995, the circuit court entered an order finding that all of the issues raised in the petition as amended were barred, except those issues raising "ineffective assistance of counsel, failure of the state to turn over to the defense exculpatory evidence, and unconstitutionality of the death penalty due to [a] pattern of racial bias in its imposition." The order set those issues not precluded for an evidentiary hearing. On October 24, 1995, the appellant filed a second amendment to his petition. The amendments, while raising a few new claims, essentially reasserted the claims raised in the original petition. The petition and the amendments are unverified. On November 8, 1995, an evidentiary hearing was held, and on November 13, 1995, the circuit court entered its order denying the petition.
On this appeal from the denial of his Rule 32 petition, the appellant raises a number of issues that were procedurally barred from the circuit court's consideration and consequently are barred from our review. He also raises issues concerning the ineffectiveness of counsel, as well as other issues. We will point out those issues that are procedurally barred and will address all issues raised by the appellant in his brief in the order in which they were presented.
The facts of this case are largely undisputed. On the night of May 21, 1990, the appellant and Olin Grimsley[3] went to the home of Ella Foy Riley in Henry County. Ms. Riley was an elderly widow, and she lived alone. The appellant, who had done yard work for Ms. Riley on previous occasions, asked to borrow money from Ms. Riley, but she refused. He then asked her if he could have a drink of water. When Ms. Riley turned away to get the appellant a glass of water, the appellant grabbed her from behind and began cutting and stabbing her in the throat with his pocketknife. During the attack, the blade of the appellant's pocketknife broke, and Grimsley handed him a knife from Ms. Riley's kitchen, with which he continued the assault. When Ms. Riley was released from the appellant's grasp, she fell to the floor and died. The cause of death was loss of blood due to the cuts to her throat and strangulation. Ms. Riley not only received deep knife cuts to her throat, but she also suffered numerous bruises to her throat and face, and the bony structure of her throat was crushed. After the attack, the appellant took Ms. Riley's purse from the kitchen counter, and he and Grimsley left in the appellant's automobile. A short distance away, they rummaged through the purse and then threw the purse and its contents along the side of the road. The following day, the appellant confessed to attacking and stabbing Ms. Riley and to taking her purse. He also led officers to where they had discarded Ms. Riley's purse, where it was recovered. The appellant did not testify at trial. The theory of his defense was that when Ms. Riley refused to lend him money, he got angry, lost control, and stabbed her, and that he took her purse only as an afterthought. His counsel argued that *834 under these facts, the appellant was guilty of the lesser included offense of murder, and that although the murder was intentional, it was not committed during the course of a robbery and therefore could not be punished capitally. See McNair v. State, 653 So.2d at 322-23.
At the hearing on the Rule 32 petition, the appellant did not testify. In fact, he called only one witness, L.D., a member of the jury in the guilt phase of the trial, for the sole purpose of substantiating his claim that the jury verdict was tainted because extraneous material had been injected into the deliberation process, i.e., reading of passages from a Bible in the jury room and praying during deliberation. He offered four juror affidavits, from L.D. and from three other members of the jury, that related to L.D.'s reading aloud from his Bible and praying in the jury room during deliberation; however, upon objection by the state, the affidavits were not admitted into evidence. He also offered a certified copy of his prison record, which was admitted into evidence insofar as it pertained to his conduct in prison before his resentencing.
Aside from the claim that the jury considered extraneous material during its deliberation, the appellant's principle argument in his brief on appeal is that his alleged history of drug abuse and his alleged use of crack cocaine on the day the crime was committed created a reasonable doubt as to his ability to entertain the specific intent to kill, and that his trial counsel were constitutionally ineffective for failing to present "numerous witnesses who were available and would have testified" regarding his history of drug abuse and his use of crack cocaine on the day of the crime. He states in his brief:
"In addition, there are serious questions about the propriety of Mr. McNair's conviction because he did not specifically intend to kill the victim in this case and because of his trial counsel's ineffectiveness. Overwhelming evidence of Mr. McNair's history of drug abuse and use of crack cocaine on the day of the crime would have created a reasonable doubt about his ability to form the specific intent to kill required under Alabama capital law. Because Mr. McNair's lawyers were ineffective, however, these facts were neither sufficiently developed nor presented to the jury or the judge. Counsel failed to present numerous witnesses who were available and who would have testified about Mr. McNair's history of drug abuse and use of crack cocaine on the day of the crime. Moreover, counsel did not obtain and present independent expert witnesses who would have testified about Mr. McNair's drug abuse, and how his use of crack cocaine rendered him unable to comprehend what he was doing during the crime. Mr. McNair was severely prejudiced by counsel's ineffectiveness because such testimony would have made it clear to the jury that he could not have formed the specific intent to kill and that he therefore was not guilty of capital murder."
The appellant did not produce any witnesses or indeed any evidence at the Rule 32 hearing to support these claims. We note that the circuit court granted the appellant's motion requesting funds to hire experts to assist him in preparing for his Rule 32 hearing, approving the sum of $5,000.
The circuit court found that the appellant was precluded under Rules 32.2(a)(2) and (5) from raising the following claims because they were raised and addressed at trial and because they could have been but were not raised on appeal:[4]
(1) That the trial court erred in overruling defense's motion for individual voir dire examination and sequestration of veniremembers during voir dire;
(2) That the trial court improperly admitted into evidence the appellant's statement and other illegally obtained evidence;
(3) That he was unduly prejudiced when the district attorney "shoved" the defense table during his argument to the jury during the guilt phase of the trial; and

*835 (4) That the state failed to turn over to the defense allegedly exculpatory evidence.
The circuit court found that the appellant was precluded under Rule 32.2(a)(2) and (4), from raising the following claims because they were raised or addressed at trial and because they were raised or addressed on direct appeal:
(1) That the state's offer and the trial court's admission into evidence of allegedly inflammatory, prejudicial photographs violated the appellant's rights;
(2) That the trial court improperly denied the appellant's motion for a change of venue;
(3) That the prosecutor argued prior bad acts to the jury based upon the appellant's nolo contendere plea in Florida; and
(4) That the prosecutor used his peremptory jury challenges in a racially discriminatory manner.
The circuit court found that the appellant was precluded under Rule 32.2(a)(3) and (4) from raising the following claims because they could have been but were not raised at trial and because they were then raised or addressed on direct appeal:
(1) That the prosecutor made improper victim impact arguments at the guilt phase of the trial;
(2) That the prosecutor allegedly poisoned the minds of the jurors by calling the appellant "vile" names;
(3) That the prosecutor attempted to diminish the jury's role in sentencing; and
(4) That the bailiff at the appellant's trial improperly testified for the prosecution.
The circuit court found that the appellant was precluded under Rule 32.2(a)(3) and (5) from raising the following claims because they could have been, but were not, raised and addressed at trial or on appeal:
(1) That the district attorney argued that the jury's job was to convict and at the sentencing phase exhorted the jury to return a death sentence;
(2) That the district attorney "disparaged" the appellant's rights;
(3) That the trial court improperly diminished the jury's sense of responsibility by instructing the jury that its penalty phase verdict was merely advisory;
(4) That the appellant's death sentence is unconstitutional because it was sought and imposed pursuant to a pattern of racial bias;
(5) That the imposition of the death penalty in this case constitutes a disproportionate punishment under state and federal law; and
(6) That the manner of execution used by the State of Alabama constitutes cruel and unusual punishment.
In addition to dismissing some of the above-stated claims pursuant to the procedural bars of Rule 32.2(a), the circuit court also dismissed some of those claims pursuant to Rule 32.6(b) because they did not "contain a clear and specific statement of the grounds upon which relief was sought, or a full disclosure of the factual basis for the claim." Those claims are:
(1) That the trial court improperly admitted into evidence the appellant's statement and other illegally obtained evidence;
(2) That the trial court improperly denied the appellant's motion for a change of venue;
(3) That the state failed to turn over to the defense allegedly exculpatory evidence; and
(4) That the appellant's death sentence is unconstitutional because it was sought and imposed pursuant to a pattern of racial bias.

I.
In his brief to this court, the appellant first contends that he is entitled to a new trial because, he says, the jury considered extraneous material during its deliberation in the guilt phase of his trial. He relies principally on Ex parte Troha, 462 So.2d 953 (Ala.1984), and Roan v. State, 225 Ala. 428, 143 So. 454 (1932), to support his contention. During jury deliberation in the guilt phase, L.D., a juror, read passages from his Bible and prayed with the other jurors. L.D. is a minister and testified that he has carried a *836 Bible in his pocket since 1975. On direct examination at the Rule 32 hearing, he testified as follows:
"Q. [Defense counsel]: Is there anything that you had with you during [the appellant's] trial?
"A. Yes, I did.
"Q. What was that?
"A. A little Bible, pocket Bible.
"....
"Q. [A]fter the evidence was presented and the lawyers made arguments and you went back to deliberate, did you have your Bible with you then?
"A. Yes, I did.
"Q. Did you read from the Bible?
"A. Yes.
"Q. Did you read out loud?
"A. Yes.
"Q. Were the other jurors listening to what you were reading?
"A. Yes.
"Q. Did reading the Bible help you decide whether Willie McNair was guilty or not?
"A. Yes."
On cross-examination, L.D. testified as follows:
"Q. [Prosecutor]: ... Is there anything that you read to the jury from the Bible or anything you prayed to the jury with ... what in the facts that you read or prayed to cause you in any manner or fashion to determine whether he was guilty? Or was it the evidence you heard in the trial?
"A. Well, like hearing the evidence from both sides and testimony from both sides, you know, and along with the praying and asking God to give us the right answer.
"Q. Okay. And when you asked God to give you the right answer, what I am asking you is: Did you, when you read from the Bible or prayed with the jury, try to influence other people's decisions as to the facts? Or was the prayer just to give you the strength to do from the evidence what you felt was right?
"A. Well, you used the word `influence.' I was influencing them. Excuse me. It's more like influencing them in a way ... to bring on the right decisions.
"....
"Q. And then, after the prayers, did y'all talk about the facts and the evidence, whatever, and then make a decision from the facts and the evidence? Is that what you did?
"A. Yes.
"Q. If I am wrong, you tell me. But nothing in your prayer or what you read in the Bible had anything to do with the facts or evidence that was presented in the courtroom or the judge's instructions as to the law, did it?
"A. Well, like I said again, after we heard both testimonies, both sides, you know, then we prayed. And, like I said, we prayed. And, you know, the only thing in the testimony and the prayer was the binding tie, you know, mixture. And we came up with the decisions. I mean it had a lot to do with praying, and a lot to do with what we heard.
"Q. My question is, though: Your prayer or reading the Bible, in any manner or fashion, what you read or what you prayed, did you try to change the facts that you heard that came from the witness stand? Is that what you tried to do? You didn't, did you?
"A. One more time, please, sir.
"Q. Right. When you read from the Bible or you prayed with the jury, okay, is what I am asking you about. Did you try to change any of the facts or the evidence that you took back there to decide on by words in the Bible? You didn't do that, did you?
"A. No. I didn't try to.
"Q. Did you pray with the jury to help make the decision as human beings as to what the right decision was on the evidence that you heard in the courtroom and the judge's legal instructions as to the law? Is that what the prayer was about?
"A. Yeah.
"Q. And then did you also discuss the facts and the evidence once again, all the jury? You did that?
"A. Yes.

*837 "Q. And then you found the defendant guilty, correct?
"A. Yes."
Although L.D. testified that he read portions of several passages from the Bible, he could specifically recall only two: Psalm 121 and Luke, 6:37. From the testimony of L.D. and statements in the briefs of the parties, it is apparent that L.D. read from a King James Version of the Bible. Courts take judicial notice of contents of the Bible, B.W. Jones, Jones of Evidence, § 130 (3d ed. 1924); H.C. Underhill, Underhill on Criminal Evidence, § 64 (3d ed. 1923), and we take judicial notice here of the entire passages L.D. recalled reading.[5]
The appellant's claim that the jury used extraneous material in arriving at its verdict was raised for the first time on October 24, 1995, in the second amendment to his Rule 32 petition, over three years after his conviction had been affirmed. L.D. testified that he first discussed the extraneous material with defense counsel about three weeks before the hearing. Even though the allegation of juror misconduct in the amended petition did not meet the specificity requirement of Rule 32.6(b) and was not one of the issues that the circuit court indicated that it would hear, the circuit court nevertheless permitted L.D. to testify and it addressed the issue on its merits. In its order denying the Rule 32 petition, it found,
"The court received testimony from [L.D.], who testified at the hearing. [L.D.] testified that he prayed and read from Psalms 121 and Matthew 7, verse 1[[6]] from the Bible. Neither of these scriptures contain material which would encourage jurors to find a defendant guilty or to recommend the death penalty."
"It is a well settled principle of law, and, further, it is fundamental to a fair trial, that jurors should consider only the evidence presented at trial." Ex parte Troha, 462 So.2d at 954. "Extraneous materials, whether they be dictionaries, law books, or Bibles, unless properly received in evidence, are not allowed in the jury room for use by a deliberating jury." Jones v. Kemp, 706 F.Supp. 1534, 1560 (N.D.Ga.1989). However, a new trial is not automatically required when a jury is exposed to extraneous material or evidence. The standard for deciding whether juror misconduct (in this case the introduction of extraneous material in the jury room during deliberation) requires a new trial in a criminal case is set forth in Roan v. State, 225 Ala. at 435, 143 So. at 460: "The test of vitiating influence is not that it did influence a member of the jury to act without evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered." See Ex parte Lasley, 505 So.2d 1263 (Ala.1987); Ex parte Troha; 23A C.J.S. Criminal Law § 1437 (1989). The Roan test mandates reversal when juror misconduct might have influenced the verdict.
Each case must turn on its own set of facts. Nichols v. Seaboard Coastline Ry., 341 So.2d 671 (Ala.1976); Allred v. State, 55 Ala.App. 74, 313 So.2d 195, cert. denied, 294 Ala. 751, 313 So.2d 203, cert. denied, 423 U.S. 859, 96 S.Ct. 113, 46 L.Ed.2d 86 (1975).
"Weighing heavily against the absolutism of a rule impeaching all extraneous *838 matter verdicts is the well established rule that jury verdicts are presumed to be correct, and that this presumption is strengthened when the trial court, as here, refused to grant a new trial. Allred v. Dobbs, 280 Ala. 159, 190 So.2d 712 (1966). It is the head on collision course of these two dominant rules  the presumption of correctness of jury verdicts versus the right to a fair and impartial trial, governed exclusively by the evidence given from the witness stand and the law given by the court  that requires us to resolve this issue on a case by case basis.
"Only by individual consideration of all attending circumstances of each case can it be determined which one of these fundamental rules must give way in accommodation to the other. We are unwilling to say every extraneous matter verdict must be set aside absent a factual showing to the reasonable satisfaction of the trial judge that the verdict is the prejudicial result of such extraneous matters. See, for example, Clay v. City Council of Montgomery, 102 Ala. 297, 14 So. 646 (1893)."
Nichols v. Seaboard Coastline Ry., 341 So.2d at 674 (emphasis original).
"Generally, accused, seeking a new trial on the ground of misconduct of the jury, sustains the burden of proof resting on him when he shows that the misconduct actually occurred, and that it was of such a character as might have been prejudicial to him...." 23A C.J.S. supra, at § 1437. The petitioner in a Rule 32 proceeding has the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle him to relief. Rule 32.3.
We conclude, after reviewing the evidence in the instant case, that the extraneous material, i.e., reading from the Bible and praying in the jury room during deliberations, was not of such a character or nature as to indicate bias or corruption or misconduct that might have affected the verdict or as to constitute prejudice as a matter of law. We find that the appellant failed to meet his burden of making a factual showing from which it could be reasonably concluded that the jury might have been unlawfully influenced in arriving at its verdict. To hold otherwise in this case would require us to resort to pure speculation and conjecture. The appellant showed that L.D. prayed and read from the Bible during the jury deliberations; however, he failed to present any evidence to support the slightest inference that the prayers and readings were prejudicial or that they might have unlawfully affected the verdict. The appellant's assertions in his briefs to this court that L.D. urged the jurors to find him guilty based on passages from the Bible and that the jury relied on the Bible in finding him guilty are not supported by the record. The appellant offered the affidavits of L.D. and three other jurors at the hearing, but the affidavits were not admitted into evidence, however, they are in the record. The refusal to admit the affidavits did not constitute error, because their admissibility was discretionary with the circuit court under the circumstances presented. See Rule 32.9. The affidavits of the three jurors, even if they had been admitted, would not change or alter our decision. They are not inconsistent with L.D.'s testimony, and, in fact, support our conclusion.
From the testimony at the hearing, we conclude that the prayers and scripture readings in the jury room were intended to encourage, and had the effect of encouraging, the jurors to take their obligation seriously and to decide the question of guilt or innocence based only on the evidence presented from the witness stand in open court. This case is clearly factually distinguishable from Troha and Roan and the other cases cited by the appellant in support of his contention. A fair reading of L.D.'s testimony, in its entirety, leads inescapably to the conclusion that his readings from the Bible and prayers in the jury room neither unlawfully influenced nor might have unlawfully influenced the jury in reaching its verdict, and did not encourage its members to consider anything other than the evidence presented in the court in arriving at a verdict. There is nothing here to suggest that the jury did anything other than base its verdict on the evidence presented in open court in the trial of the case.
We find no merit to this contention.

*839 II.
The appellant raises 14 allegations of ineffective assistance of counsel at trial and on appeal. In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."
Id. at 687, 104 S.Ct. at 2064.
"The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under `prevailing professional norms,' was `reasonable considering all the circumstances.'" Daniels v. State, 650 So.2d 544, 552 (Ala.Cr. App.1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.
When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr. App.1985).
"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
Strickland, 466 U.S. at 689,104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985).
The allegations of ineffective assistance of counsel the appellant makes in his petition are general and conclusory; he asserts no facts to support those allegations. The appellant called no witnesses at the hearing on his petition to support his allegations of ineffective assistance of counsel and the only evidence he presented was his record in prison while awaiting trial. This apparently *840 was intended to show that his counsel were ineffective at his resentencing hearings for not having obtained his prison record for such hearings, which would have shown that he had been a well behaved and cooperative prisoner. (He called only juror L.D. at the hearing, whose testimony concerned an issue unrelated to the ineffective assistance of counsel issue, i.e., the extraneous material before the jury in its deliberation). The appellant's trial and appellate counsel were present and available to testify, having been subpoenaed by the state, but were not called to testify.
The appellant fell far short of meeting his burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle him to relief. See Rule 32.3 and 32.6(b). In regard to the sole evidence introduced on this issue  the appellant's prison record  we note that the resentencing court found his good prison behavior to be a nonstatutory mitigating circumstance. We further note that the jury at the resentencing hearing recommended a sentence of life imprisonment without the possibility of parole.
As a final note, we point out that the appellant has continued to halfheartedly assert his claim of ineffective counsel before this court. In his oral argument on appeal, the appellant did not argue or discuss his claims of ineffective assistance of counsel except to say that he was relying on the allegations in his petition. He devoted his entire oral argument to the matter of the extraneous material before the jury.
The appellant, who was an indigent, contends that Alabama's statutory scheme for compensating attorneys who represent indigent defendants in capital cases, § 15-12-21(d), denied him the right to effective assistance of counsel, denied him due process and equal protection of the law, violated the doctrine of separation of powers, and constituted an unconstitutional taking of property without just compensation. We find no merit to these contentions. Our courts have consistently upheld the constitutionality of this statute when attacked on the same grounds. See, e.g., Ex parte Smith, 698 So.2d 219 (Ala.1997); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); May v. State, 672 So.2d 1307 (Ala.Cr.App.1993), writ quashed, 672 So.2d 1310 (Ala.1995); Hallford v. State. In the recent case of Ex parte Smith, the Alabama Supreme Court, addressing this identical issue, again upheld the statute. Justice Kennedy, writing for the Supreme Court in that case, discusses in detail the statutory fees, and allowances for expenses and office overhead available to appointed counsel for indigents in capital cases.
The appellant further contends in his brief on appeal that allegedly inadequate compensation placed "significant constraints on what... his counsel could do to adequately investigate and prepare his case." He further contends that "[t]he failure to adequately compensate the attorneys in this case was particularly debilitating given the unique circumstances and issues involved." Although the burden of pleading and proof was on the appellant, Rules 32.3 and 32.6(b), he alleged no facts in his petition nor did he present any at the hearing to support these contentions. There is nothing in the record from which to conclude that the appellant's trial or appellate counsel were constitutionally ineffective because of the statutory compensation in such cases. The appellant presented no evidence that the statutory compensation scheme caused counsels' performance to fall "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
We find no merit in these contentions.

III.
The appellant contends that his counsel were ineffective for failing to sufficiently interview and call as witnesses members of his family who, he says, would have testified about his alleged history of alcohol and drug abuse and how his use of alcohol and drugs before the crime allegedly rendered him unable to appreciate what he was doing when he committed the crime.[7] He also contends *841 that his counsel were ineffective for failing to obtain expert witnesses to assist in the preparation of his defense and to testify how his alleged history of alcohol and drug abuse rendered him incapable of entertaining the required intent to be found guilty of the crime charged. The appellant presented no evidence  by testimony or affidavits, written interrogatories, or depositions, see Rule 32.9(a)  to support these contentions. He did not identify any of the witnesses he claims would have testified about his alleged alcohol and drug abuse. See Williams v. State, 480 So.2d 1265 (Ala.Cr.App.1985). In reference to the appellant's contention that his counsel were ineffective for failing to obtain the assistance of an expert, he has failed to demonstrate that there was a reasonable probability that an expert would have assisted his defense. See Dubose v. State, 662 So.2d 1156, 1182 (Ala.Cr.App. 1993), aff'd, 662 So.2d 1189 (Ala.1995). The circuit court was correct in finding that there was no merit in these contentions. The appellant failed to meet his burden of establishing that his counsel were constitutionally ineffective in this regard.

IV.
The appellant contends that his trial counsel were ineffective for failing to challenge the racial and gender makeup of his Henry County jury pool at the guilt phase of his trial. He argues that his right under the Equal Protection Clause of the United States Constitution to a venire representing a fair cross-section of the community was violated because, he says, blacks and women were systematically excluded from jury service in Henry County. He avers in his unsworn petition that the percentage of blacks and women on the venire from which the jury was selected in his case was "significantly less than the percentage that those groups comprise of the total population in Henry County." He further avers that blacks made up "nearly 35%" of the county's population, and women accounted for 53%. The appellant offered no evidence at the Rule 32 hearing to prove these assertions.
"`The Sixth Amendment requires that petit juries "be drawn from a source fairly representative of the community." Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). When raising a claim under this requirement, a defendant "has the burden of establishing a prima facie case of a `fair cross section' violation. Rayburn v. State, 495 So.2d 733 (Ala.Crim.App.1986)." Pierce v. State, 576 So.2d 236, 241 (Ala.Cr.App.1990), cert. denied, 576 So.2d 258 (Ala.1991).' *842 "Sistrunk v. State, 630 So.2d 147, 149 (Ala. Cr.App.1993).
"The Supreme Court of the United States in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), established a three-pronged test that must be met before an individual can establish a violation of the `fair-cross-section' requirement. The individual alleging a violation must prove:
"`(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.'
"439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587.
"....
".... In the absence of a showing of systematic exclusion, the showing of a disparity between the percentage of blacks in the population of the county in which venue is situated and the percentage of blacks on the venire does not establish a violation of the fair cross-section requirement." Stewart v. State, 623 So.2d 413 (Ala.Cr.App.1993).'

"Sistrunk, 630 So.2d at 150."

Dobyne v. State, 672 So.2d 1319, 1328-29 (Ala.Cr.App.1994).
The appellant has failed to meet the specificity requirements of Rule 32.6(b). His allegations are merely conclusory; they are without factual basis. Moreover, he has failed to meet his burden of proof as set out in Rule 32.3. He presented no facts that would entitle him to the relief requested. He clearly has not met the three-pronged test of Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and therefore cannot show that counsel were deficient in failing to challenge the racial or gender makeup of the Henry County jury pool. We find no merit in the appellant's contentions.[8]

V.
The appellant contends that his trial counsel were ineffective because, he says, they failed to "adequately" object to what he calls the state's discriminatory use of its peremptory strikes during the selection of the jury at both the guilt and sentencing phases of his trial. The trial record shows that the appellant's trial counsel timely objected to the state's peremptory strikes of blacks after jury selection for the guilt phase, claiming that the prosecutor was guilty of racial discrimination in the exercise of his peremptory strikes. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). After the prosecutor explained the reasons for his strikes, the trial court overruled the appellant's Batson motion. We addressed the issue on direct appeal and affirmed the trial court's ruling, finding that there was no evidence of racial discrimination in the state's exercise of its peremptory strikes in selecting the Henry County jury. 653 So.2d at 323. In affirming the case, the Alabama Supreme Court addressed the issue of discrimination in selection of the Henry County jury, concluding that the trial court's ruling denying the Batson motion was not clearly erroneous. 653 So.2d at 356.
*843 The appellant fails to meet the specificity requirement of Rule 32.6(b) or the proof requirement of Rule 32.3. His allegations of the state's "intentional exclusion" of blacks from the jury by the use of its peremptory strikes and its "improper" use of those strikes are mere conclusory statements, without factual basis or support. He has failed to prove that his counsel were deficient or that he was prejudiced by any actions of his counsel in this regard. There is no merit to this argument.

VI.
The appellant contends that his trial counsel were ineffective at the guilt and sentencing phases of his trial because, he says, they failed to "adequately cross-examine important prosecution witnesses." He does not allege and he did not present any facts to show how the cross-examination of the named witnesses was deficient. Thus, he has failed to meet his burden of pleading and showing that his counsel were ineffective in the manner he alleges. See Rule 32.3 and 32.6(b).

VII.
The appellant contends that his trial counsel were ineffective because, he says, they failed to "adequately" develop and present a theory of mitigation at the sentencing phase of his trial. He specifically contends that his counsel failed to interview sufficiently unspecified family members about evidence in mitigation and to adequately prepare them to testify. He claims that these "family members" would have testified as to his alleged mental health problems, his alleged history of alcohol and drug abuse, and how his alleged use of alcohol and drugs at the time of the crime rendered him incapable of appreciating what he was doing. As discussed in Part III of this opinion, the appellant did not call any of these "family members" to testify at the Rule 32 hearing; he did not identify them; he did not submit any affidavits from any of them; and he did not state specifically what he expected their testimony to prove. His allegations failed to meet the specificity requirement, and he failed to meet the burden of proof necessary to entitle him to the relief sought.

VIII.
The appellant contends that his trial counsel were ineffective because, he says, they failed to obtain and present "independent expert witnesses" to assist in preparing his defense and to testify about his alleged mental health problems and history of drug and alcohol abuse, and how his alleged use of drugs and alcohol rendered him incapable of appreciating what he was doing when he committed the crime. Again, he failed to sufficiently plead facts and present any evidence to support his contentions. He called no witnesses and presented no evidence to show the nature of his mental problems and drug and alcohol problems, if indeed he had any. He has not shown that counsel was ineffective. See Williams, supra. He asserts in his brief that "such testimony would have made it clear to the jury that the appropriate punishment for Mr. McNair was life without parole." We note that the jury at the appellant's resentencing, by a vote of eight to four, recommended a sentence of life imprisonment without parole.

IX.
The appellant contends that his trial counsel were ineffective because, he says, they failed to object to the "unconstitutional imposition" of the death penalty in his case. It was unconstitutional, he argues, because "it was sought and imposed pursuant to a pattern of racial bias" in Henry County and the State of Alabama. He points out that his victim was white and he is black, and avers that the death penalty was sought and imposed in his case because of his race and "status" as compared with the race and "status" of the victim. He argues that if the victim had been poor and black, and he affluent and white, he would not have been sentenced to death. This contention was one of the claims expressly addressed at the Rule 32 evidentiary hearing.
Foremost, we note that the appellant's death sentence was imposed by the trial court, after it had rejected the recommendation by a Montgomery County jury  *844 not a Henry County jury  of life imprisonment without the possibility of parole. Moreover, the majority of the Henry County jury  whose recommendation of the death sentence was ultimately without effect  was black.[9] The appellant presented no evidence at the hearing to support his contentions. Thus, he failed to meet his burden of proving that his death sentence was sought and imposed pursuant to a pattern of racial bias. His contentions are nothing more than bare allegations, unsupported by any facts. He failed to meet the burden of showing that his counsel were ineffective for failing to raise the issue asserted here.

X.
The appellant contends that his trial counsel at his resentencing hearing on remand and his counsel on appeal were ineffective because, he says, they failed to argue and present evidence that his death sentence was disproportionate to sentences imposed in similar cases, and particularly disproportionate to the sentence of life imprisonment imposed on his codefendant Grimsley, who was convicted of first degree robbery. See note 3, supra. He further contends that the Alabama Supreme Court failed to conduct the proportionality review required by § 13A-5-53(b)(3) to determine if the death penalty was appropriate in his case. The appellant also contends that his trial counsel failed to argue and present evidence that no crime similar to the one he was convicted of had been punished capitally in Alabama. He presented no evidence at the Rule 32 hearing to support these contentions. He did not point to any cases to support his contention that his death sentence was disproportionate to sentences imposed in similar cases and he did not offer any evidence to show why his penalty was disproportionate to that of his codefendant Grimsley. Further he did not state the basis of his contention that the Supreme Court failed to conduct a proportionality review, and finally he offered no evidence to show that, based on the facts of his case, no similar crime had been punished capitally in Alabama.
We reviewed the propriety of the death penalty in this case as required by § 13A-5-53 on direct appeal. 653 So.2d at 352-53. We stated as follows:
"We have searched the record and found no error adversely affecting the rights of the appellant at any stage of the proceedings. The trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence.
"In determining that death is the proper sentence in this case, we find that the sentence of death was not imposed under the influence of any passion, prejudice, or other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. Here, the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant."
Id. On direct appeal to the Alabama Supreme Court, that Court, in affirming the conviction and sentence, also reviewed the propriety of the death penalty as required by § 13A-5-53. It held as follows:
"We have considered the opinions of the Court of Criminal Appeals and the merits of all the issues raised by McNair, and we have carefully searched the record for any plain error; we have found no errors in either the guilt phase or the sentencing phase of the trial that adversely affected McNair's rights. We conclude that the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence and that the death sentence was proper under the circumstances."
653 So.2d at 360-61.
As to the appellant's argument that his sentence of death was disproportionately severe in view of the fact that his codefendant, who was convicted of robbery in the first degree, was sentenced to life imprisonment, *845 we note that the United States Constitution does not require state appellate courts to compare a defendant's death sentence with sentences imposed in similar cases to determine if the death sentence was proportionate. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); Wright v. State, 494 So.2d 726 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987). "The constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences." Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586 (1970). However, a proportionality review has been required in Alabama since Beck v. State, 396 So.2d 645 (Ala.1980); such a review is now statutorily required. See § 13A-5-53. For a discussion of the principles involved in a proportionality review under our death penalty act, see Williams v. State, 461 So.2d 834 (Ala.Cr.App.1983), rev'd on other grounds, 461 So.2d 852 (Ala.1984), and cases cited therein, and Wright v. State. While our statute obliges us to consider the punishment given any accomplices, it does not require that every defendant involved in a crime receive the same punishment. Williams v. State. Each case must be evaluated on its on peculiar facts, and the fact that the defendant is the triggerman is sufficient to distinguish the defendant from the others involved in the crime for the purpose of the death penalty. Id. In the instant case, the death sentence was justified because the appellant was, in effect, the triggerman  he wielded the knife and personally inflicted the wounds that killed the victim. His sentence was not disproportionately severe when compared to the sentence received by his codefendant.
The appellant's contention that his death sentence was disproportionate to sentences imposed in similar cases is a conclusion in his petition that he did not factually support; it would not have been possible for him to do so. Crimes similar to the crime committed by the appellant in the instant case are being punished capitally throughout the state. See, e.g., Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Hinton v. State, 548 So.2d 547 (Ala. Cr.App.1988), aff'd, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). In fact, two-thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of robbery-murder. Beck v. State, 396 So.2d 645, 654 n. 5 (Ala.1980); Kuenzel v. State.
In regard to the appellant's argument that the Alabama Supreme Court failed to conduct a proportionality review of his sentence as required by § 13A-5-53, we note that he did not indicate the basis for such a conclusion. After reading the opinion of our Supreme Court affirming the appellant's conviction and death sentence, we conclude that that opinion indicates that it complied with the statute and properly reviewed the proportionality of the appellant's sentence. In affirming the appellant's conviction and death sentence, it stated that it had "considered... the merits of all the issues raised by McNair," and this was an issue raised by the appellant on appeal. Ex parte McNair, 653 So.2d at 360. While the Supreme Court did not use the word "proportionality" in its opinion, we believe that the opinion in its entirety, and particularly that portion where the Court stated that it had considered the merits of all the issues raised, and it's conclusion "that the death sentence was proper under the circumstances," clearly indicates that it reviewed the propriety of the death sentence in all its aspects, which would necessarily include the proportionality aspect.
The appellant's assertion that no similar crime has been punished capitally in Alabama is simply not true. The facts of his case are that a murder was committed during the course of a robbery in the first degree, which unfortunately is an all too common occurrence in our state today, and such crimes, as we have noted above, are frequently punished by the imposition of the death penalty.
*846 The appellant has failed to meet his burden of showing ineffective assistance of counsel in reference to these matters. We find no merit in his contentions.

XI.
The appellant contends that his trial counsel failed to object adequately to the manner of execution used by Alabama  electrocution  on the basis that, he says, it constitutes cruel and unusual punishment in violation of the Eighth Amendment.
"The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: `Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there is something inhuman and barbarous,  something more than the mere extinguishment of life.' Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned `that this act was passed in the effort to devise a more humane method of reaching the result'. Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir.1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death."
Jackson v. State, 516 So.2d 726, 737 (Ala.Cr. App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986).
The appellant also contends that trial counsel should have argued that Alabama "utilizes inadequate equipment, unqualified personnel, and inadequate procedures" and that Alabama's electric chair has consistently resulted "in excessive burning and mutilation of condemned prisoners and rendered death by electrocution in Alabama unpredictable and consistently torturous," as, he asserts, is evidenced by the executions of Horace Dunkins and John Evans (in those executions repeated applications of electrical current were required because of a malfunction in the apparatus) and by the executions of Dunkins, Michael Lindsay, and Wayne Ritter (post-execution examinations revealed burns to portions of the prisoners' bodies).
"In Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), the United States Supreme Court, in addressing the issue of whether it was cruel for a state to electrocute a prisoner after the state's first attempted electrocution failed, stated:
"`The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution.... We cannot agree that the hardship imposed upon the petitioner rises to that level of hardship denounced as denial of due process because of cruelty.'
"Id. at 464, 67 S.Ct. at 376-77.
"The very issues raised by appellant here were addressed in Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala.1983), aff'd. in part, rev'd in unrelated part, 726 F.2d 1505 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218[, 83 L.Ed.2d 148] (1984), wherein the court adopted the opinion and views expressed by Judge Sam C. Pointer after a hearing on the issues, in Raines v. Smith, No. 83-P-1080-S [, 1983 WL 3310] (N.D.Ala.) (unpublished order entered June 3, 1983) (certified copy attached as Appendix, Ritter v. Smith, 568 F.Supp. at 1525-27). The claims presented to Judge Pointer were as follows: (1) given the nature of the equipment and the procedures used, there was unnecessary and wanton infliction of pain and suffering upon persons subject to electrocution in Alabama; (2) the equipment and method involve an unreliable method of execution; and (3) electrocution involves, in its method and equipment, a mutilation of the body which *847 should be viewed as contrary to and violative of the Eighth Amendment. Id. at 1525-26.
"After an evidentiary hearing, Judge Pointer held that the claims were due to be dismissed. Id. at 1527. In reaching this decision, Judge Pointer noted that the testimony established that over the past 50 years the chair in question had been used approximately 154 times without any failure; that Evans suffered no pain after the initial shock; and that the possibility that the chair may malfunction at some time in the future does not render its use unconstitutional. Id. at 1526. Judge Pointer relied upon Francis v. Resweber and In re Kemmler, [, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890),] in holding that Alabama's method of electrocution is constitutional. Id. at 1526-27. We agree.
"There is no evidence before this court that contradicts the findings made by Judge Pointer. There has been absolutely no showing that the State's method of enforcing a death sentence inflicts any more pain than is absolutely necessary. It has not been established that the equipment used in the electrocution of John Lewis Evans malfunctioned or that Evans felt anything after the first split second of the first jolt of electricity administered."
Jackson, 516 So.2d at 738.
Therefore, we disagree with the appellant's argument that his counsel were ineffective for failing to object to the manner of execution used in Alabama; that issue has been decided adversely to the appellant's claim.

XII.
The appellant contends his trial counsel were ineffective because they failed to object at the sentencing phase of his trial to what he calls "improper victim impact evidence, improper sentencing recommendations from the community, and [a] presentence report that was based on improper hearsay evidence."
The appellant did not allege in his petition or present any evidence at the hearing specifying what victim impact evidence he believes was improper and what his counsel should have objected to. We note that the appellant raised a claim on direct appeal of his case relating to the admission into evidence of a victim's impact statement, which this court rejected. 653 So.2d at 331-335.
The appellant also did not allege or offer any evidence specifying what in the presentence report constituted the "hearsay" evidence he found objectionable. Section 13A-5-47(b) provides for the use of a presentence report by the trial court. Rule 26.3, Ala. R.Cr.P., prescribes the contents of the presentence investigation report. We have held that the presentence investigation report itself is an out-of-court statement and is entirely hearsay. Williams v. State, [Ms. CR-92-0382, August 23, 1996] ___ So.2d ___ (Ala.Cr.App.1996). The record in this case shows that the trial court ordered and received a presentence investigation report as required, which was made available to the appellant and his counsel before the sentencing.
The appellant's contention that his trial counsel were ineffective for failing to object to "improper sentencing recommendations from the community" is based on exhibits that were offered by the appellant at his Rule 32 hearing, but that were not admitted into evidence by the circuit court. These exhibits are included in the record and are copies of petitions signed by various persons urging that the appellant be sentenced to death. These petitions were apparently discovered in the probation officer's file. Some of the petitions are addressed to the trial judge and some to the probation "office." The trial court stated at the Rule 32 hearing that it did not recall seeing the petitions. The appellant did not call the probation officer or his trial or appellate counsel as witnesses to ascertain what use, if any, had been made of the petitions, and, in fact, he presented no evidence to show that the petitions had ever been shown to anyone, particularly to the trial judge. The presentence reports filed by the probation officer make no sentence recommendation, and contrary to the assertions of the appellant's counsel in this Rule 32 proceeding, make no reference to the petitions.
*848 In conclusion, we find that the appellant failed to meet his burden of proof to establish that his trial counsel were deficient or ineffective in failing to object at the sentencing hearing to the so-called victim impact evidence, sentencing recommendations from the community, and the presentence report.

XIII.
The appellant contends that trial counsel were ineffective because they failed to object to the trial court's override of the jury's sentencing recommendation of life imprisonment without the possibility of parole and because they failed to make the argument "that because the override is standardless in Alabama, there is a haphazard and inconsistent application of the ultimate sanction in a manner that is inconsistent with the precedents of the Supreme Court." He concedes that the United States Supreme Court has upheld the validity of the judicial override of advisory jury verdicts, Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). He argues, however, that because Alabama has not adopted a standard for jury override like those prescribed in Tedder v. State, 322 So.2d 908, 910 (Fla.1975) (for a trial court to impose a death sentence over a jury's recommendation of life imprisonment without parole, "the facts suggesting a sentence of death [must be] so clear and convincing that virtually no reasonable person could differ"), and Martinez Chavez v. State, 539 N.E.2d 4 (Ind.1989) (a judge may override a jury's life recommendation of life imprisonment and impose a death sentence if "the facts justifying a death sentence should be so clear and convincing that virtually no reasonable person could disagree that death was appropriate"), there is no protection against the arbitrary imposition of a death sentence.
His argument is without merit. As we held in Bush v. State, 695 So.2d 70, 94 (Ala.Cr.App.1995):
"The Tedder standard is not constitutionally mandated, Harris v. Alabama; Ex parte Jones[, 456 So.2d 380 (Ala. 1984)], and we have chosen not to read the Tedder standard into our death penalty statute.
"What we do require is that, before determining the sentence, the trial court consider all the available evidence; hear arguments on aggravating and mitigating circumstances; enter written findings of fact summarizing the crime and the defendant's participation in it; make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstance offered pursuant to § 13A-5-52; and weigh the advisory verdict of the jury; consider and weigh the presentence investigation report; hear arguments on aggravating and mitigating circumstances; consider and weigh the mitigating and aggravating circumstances; make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstance offered pursuant to § 13A-5-52; determine that the aggravating circumstances outweigh the mitigating circumstances; consider all the available evidence; and enter written findings of fact summarizing the crime and the defendant's participation in it. We believe that this scheme adequately channels the trial court's discretion so as to prevent arbitrary results."
Because it has been held that Alabama's judicial override of advisory jury verdicts is not unconstitutional and that the statutory scheme for the judicial override prevents arbitrary imposition of the death penalty, we conclude that counsels' performance were not deficient for failing to raise these issues.

XIV.
The appellant contends that the alleged errors of counsel set out in Parts II through XIII of this opinion, "individually and collectively" denied him effective assistance of counsel at trial and on appeal. We have reviewed all of his contentions individually and, as we have stated herein, he has failed *849 to meet his burden of establishing that his counsel were constitutionally deficient. We have also reviewed all of his contentions collectively, or as a whole, and find that considering them in that light they still do not show or establish that his counsel were constitutionally ineffective. We find no merit in this contention.

XV.
The appellant contends that his counsel on direct appeal were ineffective and failed to "adequately" perform their duties. He neither alleged any facts nor offered any evidence to support this conclusion. He failed to meet the specificity requirements of Rule 32.6(b), and failed to meet the burden of pleading and proof required to show that his appellate counsel were deficient or otherwise ineffective.

XVI.
The appellant contends that the trial court erred in overruling his motion requesting individual voir dire examination and sequestration of the veniremembers during voir dire examination. This issue, however, is not before us; it was procedurally barred under Rule 32.2(a)(4), because it was raised and addressed on direct appeal. McNair, 653 So.2d at 323-24. The circuit court's finding that this issue was barred was correct.

XVII.
The appellant contends that the trial court erred in admitting into evidence his inculpatory statements and all evidence seized as a result of information acquired from those statements because, he argues, the statements were the fruit of an illegal arrest. He also contends that the trial court erred in admitting the statements because, he says, they were obtained without proper Miranda[10] warnings and were involuntary. The first claim, that the appellant's statements and the evidence seized as a result of the statements should have been suppressed because they were the result of an unlawful arrest, was precluded under Rule 32.2(a)(2) and (4), because it was raised and addressed at trial and on direct appeal. It was decided adversely to the appellant. McNair, 653 So.2d at 326. The claim that the appellant's statements were obtained involuntarily and in violation of Miranda was precluded under both Rule 32.2(a)(2) or (3), and to Rule 32.2(5), because it was or could have been raised at trial or could have been and was not raised on appeal. The circuit court's finding that these claims were barred was correct.

XVIII.
The appellant's contention that the state's offer and the trial court's admission at trial of what he says were highly inflammatory and prejudicial photographs violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments was precluded under Rule 32.2(a)(4). This issue was raised on appeal and decided adversely to the appellant. 653 So.2d at 326-27.

XIX.
The appellant's contention that the trial court's denial of his motion for a change of venue violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments was precluded under Rule 32.2(a)(2) and (4). This issue was raised at trial and on appeal and was decided adversely to the appellant. 653 So.2d at 324.

XX.
The appellant contends that the prosecutor's "misconduct and improper arguments throughout the guilt and penalty phases of the trial" violated his right to due process and a fair trial. This claim was precluded under Rule 32.2(a)(4), because it was raised and addressed on direct appeal and decided adversely to the appellant. 653 So.2d at 330-41.

XXI.
The appellant contends, "The state failed to turn over to the defense exculpatory evidence and information in violation of Brady v. Maryland [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and Federal and Alabama *850 Law." In his original petition, he alleged the following:
"The prosecutor and other state officials did not make available to the defense the complete prosecution file and other exculpatory materials, including mitigating evidence, in violation of Ex parte Monk, 557 So.2d 832 (Ala.1989), and state and federal requirements in capital cases. Thus, exculpatory materials and critical mitigating evidence were withheld in violation of Temporary Rule 18, of the Alabama Rules of Criminal Procedure, Rule 16 of the revised Alabama Rules of Criminal Procedure, and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
"The state's withholding of this information denied Mr. McNair his rights to due process, a fair trial and a reliable sentencing proceeding in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Alabama law."
The state claimed in its answer that the issue was precluded because it was raised at trial, which it was, and could have been, but was not, raised on direct appeal, and in addition that it was subject to dismissal because it lacked specificity. Rule 32.2(a)(2) and (5); Rule 32.6(b). The circuit court dismissed this claim, finding that it did not contain a clear and specific statement of the grounds upon which relief was sought, including a factual basis to support it. Rule 32.6(b).
Thereafter, the appellant filed a purported amendment to his petition, which, among other things, restated this claim using the same language after alleging that the reason for the amendment was to make the allegation more specific so as to comply with Rule 32.6(b). Subsequently, he filed a second purported amendment, again restating this claim in the exact same language.
The circuit court correctly found that this claim clearly failed to meet the specificity requirement of Rule 32.6(b). However, this is one of the claims the circuit court heard at the evidentiary hearing on the petition. It was heard on its merits and denied.
"`A Brady violation occurs where: 1) the prosecution suppressed evidence; 2) the evidence was favorable to the defendant; and 3) the evidence was material to the issues at trial.'" Johnson v. State, 612 So.2d 1288, 1293 (Ala.Cr.App.1992) (quoting Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990)).
"`The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'"
Johnson, 612 So.2d at 1293 (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). The courts make no distinction between exculpatory and impeachment evidence for Brady purposes. United States v. Bagley; Shields v. State, 680 So.2d 969 (Ala.Cr.App.1996).
In his brief to this court, the appellant argues that the state withheld four items of allegedly exculpatory information or material: (1) an audiotape of a statement made by the appellant's codefendant Grimsley, (2) "mitigating evidence," (3) "improper victim impact evidence," and (4) "evidence of prejudicial bias against Mr. McNair by law enforcement officers."
In regard to the first item allegedly withheld  an audiotape of a statement made by Grimsley  there is absolutely no evidence in the record to show that Grimsley ever made such a statement. The only audiotape mentioned in this proceeding is the February 21, 1997, audiotape of a conversation between a Henry County Sheriff's Office investigator and Lyn Stokes, a private investigator, in which Stokes relayed the contents of his alleged conversation with Grimsley in July 1990. This tape was introduced in support of a motion to dismiss the indictment in Grimsley's second trial in the Montgomery County Circuit Court. For a more detailed discussion of this tape and how it came to exist, see Grimsley v. State, 632 So.2d 547, 548-52 (Ala.Cr.App.1993).
It appears that Stokes, in response to a request by a member of Grimsley's family, contacted Grimsley shortly after he had been charged with the crime involved in this case and discussed with him his possible employment *851 of a certain law firm to represent him. Grimsley allegedly related to Stokes his version of what happened. Sometime later, Scott Hedeen, assistant district attorney of Henry County, mentioned to Rex Tipton, an investigator with the Henry County Sheriff's Office, that someone needed to talk with Stokes about information he allegedly had concerning the crime. On February 21, 1992, Tipton tape-recorded a statement from Stokes relating what Grimsley had allegedly told him about the commission of the crime. A few days later, Tipton told Hedeen what Stokes had said and told him that the tape-recording of the conversation was available. The tape-recording was never used by the state. The hearsay contents of the Stokes-Tipton tape are quoted in their entirety in Grimsley, 632 So.2d at 549, as follows:
"`The appellant related the following: [H]e was being charged with capital murder, a murder he did not commit and that the other Defendant had picked Mr. Grimsley up sometime that day, that they had rode around and had bought some crack cocaine from a location that he did not advise me of and they had smoked crack cocaine and they had run out of money. And the other Defendant advised him he knew where he could get some money and they went to a house of a woman that the Defendant used to work for, to cut yards, and upon arriving there both of the subjects went up to the house and the other Defendant talked to the lady that came to the door. Was an older white female and that both subjects went in the house with the white female, and that he asked the white female if he could use her phone to make a phone call and she told him yes. And that he went  ... Said that he went to the telephone, picked up the receiver and started dialing a number, and Mr. Grimsley said that while he was dialing the number, he heard a noise, and that he turned around and looked and saw the other Defendant had this white female around the throat and that he saw blood coming out of her and that he got scared and dropped the phone and ran back outside to the car and got in the car and waited there until the other Defendant came back out to the car and got into the car and then they drove off. He just kept reiterating that uh, he didn't touch the woman and that uh, and that was why he wanted an attorney to get him out of this, and he didn't think it would be any problem."
We find no Brady violation here with reference to the audiotape concerning Stokes's hearsay account of the alleged contents of a statement by Grimsley. The Stokes-Tipton tape was not even in existence at the time of the appellant's trial. The recording was made on February 21, 1992; McNair was found guilty on April 18, 1991. The tape was in existence at the appellant's resentencing (January 25-28, 1993). However, no evidence has been presented from which it could be reasonably concluded that the tape or its contents were suppressed by the state, e.g., trial counsel did not testify that they had not been provided the tape or that they had not been made aware of its contents before the resentencing. Moreover, the only hearsay rendition by Stokes of any alleged comment by Grimsley that might have been remotely beneficial to McNair at sentencing was Grimsley's purported statement that he and the appellant had purchased and smoked crack cocaine during the day of and before the commission of the crime. However, this hearsay was cumulative of other evidence of the appellant's alleged drug use on the day of the crime that was introduced and admitted at the appellant's trial.
The appellant has sorely failed to meet his burden under Rule 32.3 in regard to his contention that the state withheld mitigating evidence. He did not plead or prove any facts to support this claim. He did not even identify the mitigating evidence he thinks was withheld.
In regard to the appellant's contention that the state withheld what he calls "improper victim impact evidence," again, he did not specify in his petition what victim impact evidence he was referring to, and no evidence was admitted at the hearing to support the contention. We will presume for the sake of his argument that, by "improper victim impact evidence," he is referring to the petitions found in the probation officer's file, *852 signed by various persons in the community urging the court to sentence the appellant to death, and which were not admitted into evidence at the evidentiary hearing.[11] See Part XII of this opinion. Clearly, the appellant failed to prove a Brady violation in reference to these petitions. There is no evidence that these petitions were suppressed, and they certainly were not exculpatory or material.
In regard to the appellant's contention that the state withheld "evidence of prejudicial bias" against him "by law enforcement officers," he did not allege or present any facts to support this contention. In his brief to this court, apparently, in an effort to support this argument, he cites a page from the record, but offers no explanation as to why that page has any bearing on the issue. The page cited contains one of the petitions urging that the appellant be given the death penalty found in the probation officer's file, which was not admitted into evidence. Even if this petition had been admitted in evidence at the evidentiary hearing, the appellant offers no explanation as to why he thinks it was exculpatory. We are left to speculate. We note that "Rip Hatcher" signed one of the petitions. The trial record shows that "Rip Hatcher" was a deputy sheriff who participated in the investigation of this crime, and testified at both the guilt and sentencing phases of the appellant's trial. No evidence was offered to show that Deputy Hatcher was the "Rip Hatcher" that signed the petition.
We must conclude that the appellant failed to establish a Brady violation. First, assuming that the petition had been admitted into evidence in this Rule 32 proceeding and that the appellant had proved that the deputy had indeed signed the petition, it does not necessarily follow that the fact that he signed such a petition was exculpatory. Even assuming that Deputy Hatcher may have believed that the death sentence was appropriate in this case, it does not necessarily follow that he was biased against the appellant. Second, the appellant has failed to show that any information was suppressed. There is no evidence showing when the petition in question was discovered and no proof that trial counsel were not aware of this petition when the case was tried. Finally, even if, arguendo, the prosecution had suppressed this information before trial, the information was still not material. There was no reasonable probability that, had the petition been disclosed or discovered before or during the trial, the results of the proceedings would have been different.
To summarize, the appellant failed to prove that any exculpatory evidence was withheld, that any exculpatory evidence existed, or that any evidence asserted to be exculpatory was material. The circuit court's denial of the appellant's Brady claim was proper. In addition to a Brady claim, the appellant alleged a violation of the "open file" rule established in Ex parte Monk, 557 So.2d 832 (Ala.1989). He failed, however, to prove a violation of this rule. An open file order was in effect during the trial of this case in the lower court, and was continued during the instant proceedings. The circuit court correctly denied relief on this claim.

XXII.
The appellant contends that the trial court "improperly diminished the jury's sense of responsibility by instructing the jury that its penalty phase verdict was merely advisory." This claim was precluded under to Rule 32.2(a)(4), because it was raised and addressed on direct appeal; the issue was decided adversely to the appellant. McNair, 653 So.2d at 342.

XXIII.
The appellant's argument that the trial court's bailiff "improperly testified for the prosecution," was precluded under Rule 32.2(a)(4), because it was raised and addressed on direct appeal. We, as well as the Alabama Supreme Court, addressed this claim and found that no reversible error occurred by the trial court's allowing its bailiff to testify under the circumstances in this *853 case. Ex parte McNair, 653 So.2d at 358; McNair, 653 So.2d at 330.

XXIV.
The appellant contends that the jurors failed to answer voir dire questions truthfully. He argues that this deprived him of his constitutional right to an impartial jury and his right to have questions answered truthfully by prospective jurors so that he could wisely exercise his peremptory strikes. Apparently in support of this claim, he refers us in his brief to the affidavit of T.T., a juror, which was one of four affidavits offered at the Rule 32 hearing to support the appellant's claim that the jury prayed and engaged in Bible readings during its deliberation. See Part I of this opinion. The record of the Rule 32 hearing shows the following: "THE COURT: ... What is the topic of those affidavits? Not exactly what they said, but what are they challenging? [Defense counsel]: They relate to the testimony of [L.D.]." T.T.'s affidavit was not admitted into evidence.
The only reference to the alleged failure of jurors to answer voir dire questions truthfully appeared in the appellant's second amendment to his Rule 32 petition, and it was merged with his claim that the jurors relied on extraneous material in reaching their verdict. It was never specifically brought to the circuit court's attention by the appellant. For a better understanding of this issue, we quote this claim from the appellant's petition, in its entirety:
"Juror's [sic] failed to answer voir dire questions truthfully and jurors relied on extraneous evidence in reaching their verdicts at Mr. McNair's capital trial.
"... Mr. McNair was deprived of his constitutional right to be tried by an impartial jury, his right to strike a petit jury from a panel of qualified, fair-minded and impartial prospective jurors, his right to have questions answered truthfully by prospective jurors to enable his counsel to exercise their discretion wisely in exercising their peremptory strikes, his right to confront evidence against him, and his right to a fair trial because jurors improperly considered extraneous evidence and relied on outside sources and materials in reaching a decision in violation of state and federal law. Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Jones v. Kemp, 706 F.Supp. 1534 (N.D.Ga.1989); Ex parte Troha, 462 So.2d 953 (Ala.1984); McCray v. State, 565 So.2d 673 (Ala.Cr.App.1990). The juror misconduct in this case violated Mr. McNair's rights protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, the Alabama Constitution and Alabama law."
As is apparent from this excerpt, the appellant's contention that jurors failed to answer voir dire questions truthfully is unsupported by any factual assertions. It clearly did not meet the specificity requirement of Rule 32.6(b). In addition, no admissible evidence was offered at the hearing to support these conclusory allegations. The appellant presented no evidence to show that any juror answered voir dire questions falsely, withheld any information requested, or was not qualified to serve on the jury. T.T.'s affidavit was ruled inadmissible by the circuit court when offered to support the appellant's extraneous materials claim, and the appellant does not question that ruling on appeal.
Even though T.T.'s affidavit was not admitted into evidence, it is in the record and we have examined it. We find nothing in the affidavit from which it could be reasonably concluded or inferred that T.T. or any other juror gave false answers to questions on voir dire.
The appellant failed to meet his burden of proving his claim as required by Rule 32.3, and the circuit court's denial of the petition on this ground was proper.

XXV.
The appellant contends that "[t]he prosecutor improperly used his peremptory challenges in adiscriminatory manner." This claim is precluded under to Rule 32.2(a)(2), because it was raised and addressed at trial. It was precluded pursuant to Rule 32.2(a)(4), because it was raised and addressed on direct appeal by this court and the Alabama Supreme Court. We found no *854 inference of racial discrimination in the prosecution's exercise of its peremptory strikes, and the Supreme Court, agreeing with this court that the appellant was not entitled to a new trial on the ground that the prosecutor engaged in purposeful discrimination in selecting the jury, concluded that the trial court's ruling on the appellant's Batson objection was not clearly erroneous. McNair, 653 So.2d at 323; Ex parte McNair, 653 So.2d at 354-58. See also Part IV of this opinion. The circuit court correctly determined that this claim was precluded.

XXVI.
The appellant contends, "Black people and women were underrepresented in the pools from which [his] jury venire and grand jury were selected." This claim was precluded under Rule 32.2(3) and (5), because it could have been raised at trial and on appeal but was not. The trial court correctly found this claim to be precluded. See also Part IV of this opinion.

XXVII.
The appellant contends that his death sentence is unconstitutional because "it was sought and imposed pursuant to a pattern of racial bias." The appellant's allegation lacked the required specificity and contained no factual basis to support it. Although this claim could have been precluded pursuant to Rule 32.2(a)(3) and (5), because it could have been but was not raised at trial or on appeal, the circuit court heard it at the evidentiary hearing. The appellant presented no evidence at the hearing to support this claim, and, thus, failed to meet his burden of proof under Rule 32.3. With this deficiency, the trial court was correct in finding that this claim lacked merit. See also Part IX of this opinion.

XXVIII.
The appellant contends that the imposition of the death penalty in his case constitutes a "disproportionate punishment under state and federal law." This claim was precluded under Rule 32.3(a)(4), because it was raised and decided adversely to the appellant by this court and the Supreme Court on direct appeal. McNair, 653 So.2d at 352-53; Ex parte McNair, 653 So.2d at 360-61. The circuit court correctly ruled that this issue was precluded. See also Part X of this opinion.

XXIX.
The appellant's contention that his death sentence should be vacated because his execution would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments was precluded because it could have been but was not raised at trial or on appeal. Rule 32.2(a)(3) and (5). Moreover, this contention has no merit. See also Part XI of this opinion.

XXX.
The appellant's contention that the trial court's override of the jury verdict of life imprisonment without the possibility of parole was improper and arbitrary and violated his rights to equal protection and due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments is precluded because it was raised on direct appeal. Rule 32.2(a)(4). The attorney general correctly points out that this issue was raised in the appellant's brief in the Alabama Supreme Court and that, although that court did not specifically address the issue, it stated in its opinion affirming his conviction and sentence that it had "considered ... the merits of all the issues raised by McNair...." 653 So.2d at 360. Moreover, this contention has no merit. See Part XIII of this opinion.

XXXI.
The appellant contends that the cumulative effect of the alleged errors enumerated in his brief to this court violated his rights to due process and a fair trial under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments and entitled him to a new trial. We do not agree. We have reviewed each and every allegation of error, including the allegations of ineffective assistance of counsel, and have found either that they are without merit, that the appellant failed to prove them, or that they were barred from collateral review. We have also reviewed all of his *855 alleged errors collectively or as a whole, and still find no error or violation of his rights.
After reviewing all of the issues raised by the appellant on this appeal, we find that the judgment of the circuit court denying his petition for post-conviction relief is due to be affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala. Code 1975.
AFFIRMED.
All Judges concur.

On Application for Rehearing
PATTERSON, Retired Appellate Judge.
On application for rehearing the appellant calls our attention to an error in our opinion. We incorrectly stated, "the circuit court granted the appellant's motion requesting funds to hire experts to assist him in preparing for his Rule 32 hearing, approving the sum of $5,000." Included in the record is a motion for funds for an expert, which was granted, but which pertains to James Harvey Callahan, CC-82-464.60. It is unclear why this motion is a part of the appellant's record on appeal.
The circuit court denied the appellant's motion requesting funds to hire an expert to assist him in preparing for his Rule 32 hearing; however, that fact does not persuade us to alter our holding affirming his conviction and sentence.
The appellant raises no new issues in his application for rehearing, and all issues raised therein were fully addressed and considered by us in our opinion of July 3, 1997.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED; RULE 39(k) MOTION DENIED.
All Judges concur.
NOTES
[1] On second remand, we specifically ordered the trial court to do the following:

"a. In this regard, the trial court shall enter a specific written finding concerning the mitigating circumstance defined in § 13A-5-51(1): "The defendant has no significant history of prior criminal activity.'
"b. The trial court shall reconsider the finding of the aggravating circumstance that the offense was `especially heinous, atrocious, or cruel,' § 13A-5-49(8), under the standard of Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), and determine whether this crime is one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' " 653 So.2d at 347.
[2] On third remand, we ordered the trial court to do the following:

"1. Carefully and conscientiously examine and reconsider its determination that death is a proper sentence in this case and that the recommendation of the jury should be rejected.
"2. Carefully and conscientiously reweigh the aggravating and mitigating circumstances the trial court finds applicable in this case.
"3. Enter a new, independent, self-sufficient, and complete sentencing order which contains no reference to its prior sentencing orders.
"4. Set forth in that sentencing order specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance offered pursuant to § 13A-5-51, and any additional mitigating circumstances offered pursuant to § 13A-5-52."
653 So.2d at 350.
[3] Olin Grimsley was originally indicted for the same capital offense  murder committed during the course of a robbery. His trial was moved from Henry County to Montgomery County. At his first trial for the capital offense, a mistrial was declared when the jury was unable to reach a verdict. He was then retried and was acquitted of the capital murder charge, but was found guilty of robbery in the first degree, § 13A-8-41. This court reversed his robbery conviction in Grimsley v. State, 632 So.2d 547 (Ala.Cr.App. 1993), because the trial court had denied him the right to fully cross-examine a state's witness. He was tried again on the robbery charge and was again found guilty of robbery in the first degree and was sentenced to life imprisonment. He appealed, and we remanded the case so that the trial court could conduct a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), hearing after considering the Alabama Supreme Court's decision in Ex parte Thomas, 659 So.2d 3 (Ala.1994). Grimsley v. State, 678 So.2d 1194 (Ala.Cr.App. 1995). On return to remand, we affirmed the conviction and sentence on January 19, 1996, and the Alabama Supreme Court denied certiorari review on May 17, 1996.
[4] The procedural bars contained in Rule 32.2(a), Ala.R.Crim.P., apply in death cases. Brownlee v. State, 666 So.2d 91 (Ala.Cr.App.1995).
[5] Psalm 121 reads as follows:

"I will lift up mine eyes unto the hills, from whence cometh my help.
"My help cometh from the Lord, which made heaven and earth.
"He will not suffer thy foot to be moved: he that keepeth thee will not slumber.
"Behold, he that keepeth Israel shall neither slumber nor sleep.
"The Lord is thy keeper: the Lord is thy shade upon thy right hand.
"The sun shall not smite thee by day, nor the moon by night.
"The Lord shall preserve thee from all evil: he shall preserve thy soul.
"The Lord shall preserve thy going out and thy coming in from this time forth, and even for evermore."
Luke, 6:37 reads as follows:
"Judge not, and ye shall not be judged: condemn not, and ye shall not be condemned: forgive, and ye shall be forgiven...."
[6] The record shows that the juror read from Luke, 6:37. The appellant does not question this discrepancy. While the circuit court mistakenly cited a different passage from the Bible in its order, the mistake would have no effect upon its decision or upon ours because Matthew, 7:1 and Luke, 6:37 are substantially the same.
[7] We note that, at the guilt phase of the appellant's trial, Andrew Williams testified for the defense that the appellant had a drug problem and that, when he came home on the evening after the killing, he was "on drugs."

We also note that the trial court, in its sentencing order, made the following findings which are relevant to the appellant's mental and emotional condition as well as to his use of drugs at the time of the commission of the crime:
"The Court does not find that the Defendant was under the influence of extreme mental or emotional disturbance at the time of the commission of the crime. The February 21, 1991, forensic psychological evaluation of Dr. Michael T. D'Errico reflects that the Defendant's behavior was not affected by any psychiatric symptoms at the time of the offense and that he gave a detailed and descriptive account of the incident as he did in the statements which he made to law enforcement officers the next day.
"....
"The Court does not find that the Defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Although there was evidence presented that the Defendant had used cocaine several hours prior to the crime, the jury was instructed as to voluntary intoxication but did find the Defendant guilty of the capital offense[,] negating any premise that the Defendant's mental capacity was diminished. The Defendant's accounts of the crime the next morning were very clear and detailed, indicating that he was not suffering from any material disabilities or impairments when the crime was committed.
"....
".... He was involved in sports at Abbeville High School until he was expelled for selling drugs upon the school grounds during his junior year in high school."
The prison records, which are a part of the record on this appeal, do not indicate that the appellant was suffering from any mental problems or that he was addicted to drugs. In fact, they indicate the opposite. While the appellant apparently advised the prison authorities when he was first imprisoned for the commission of this crime, that he had used various kinds of drugs and alcohol, the prison records, which include the results of monthly examinations by the prison psychologist, dating from the beginning of his incarceration, indicate a normal, stable individual with no significant mental problems.
[8] We note that on direct appeal to the Alabama Supreme Court the appellant, for the first time, challenged the constitutionality of the method of selecting the forepersons of grand juries in Henry County. He contended that no black person had presided over a grand jury in Henry County for 20 years, including the period during which the grand jury that returned the indictment in his case was convened. The Supreme Court, in concluding that there was no merit in his contention, found "no indication in the record that officials have ever engaged in the practice of purposeful discrimination in selecting individuals to preside over grand juries in Henry County." 653 So.2d at 360. We further note that the appellant, while questioning the makeup of the jury pool, makes no mention of the racial makeup of the jury that found him guilty or the venire from which it was selected. The record of the trial is interesting in this regard. It shows that there were 64 members of the venire from which the jury was selected. Eighteen (or 28%) of those members were black. The state used 11 of its peremptory strikes to remove blacks. Seven blacks served on the appellant's jury. The record shows that the black population of Henry County was estimated to be between 33% and 40%. Blacks made up 58% of the jury that tried the appellant. The trial record does not disclose the number of women on the trial jury or on the venire.
[9] The Henry County jury that convicted the appellant consisted of 7 blacks and 5 whites. This jury was selected from a venire that was 28% black. The black population of Henry County was approximately 35% at the time. This majority black jury recommended a sentence of death by a vote of 10 to 2.
[10] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[11] The appellant does not question on appeal the circuit court's ruling sustaining the state's objection to the admission of the petitions. That ruling is not before us for review.